360 S.E.2d 240

**David K. HEYDINGER, M.D., Director, West Virginia Department of Health**

v.

**Ida Mae ADKINS, d/b/a Adkins Rest Home.**

**No. 17508.**

Supreme Court of Appeals of West Virginia.

July 22, 1987.

---

464

Charles G. Brown, Atty. Gen., J. Bradley Russell, Asst. Atty. Gen., for appellant.

Guy R. Bucci, J. Michael Ranson, Bucci & Ranson, Charleston, W.Va., for appellee.

McHUGH, Justice:

This case is before this Court upon an appeal by Dr. David L. Heydinger, the Director of the West Virginia Department of Health (hereinafter the "DOH") from an order of the Circuit Court of Lincoln County. The order denied permanent injunctive relief sought by the DOH against Ida Mae Adkins, the appellee, enjoining her from operating a personal care home known as Adkins Rest Home in Hamlin, Lincoln County.[1] This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel.

I

The Adkins Rest Home was originally licensed under the classification of a "personal care home" by the DOH pursuant to *W.Va.Code*, 16–5C–2(d) [1979].[2] Because the home lacked the requisite staff and physical facilities to administer proper "nursing care," it could not qualify as a "nursing home" under *W.Va.Code*, 16–5C–2(c) [1979].[3] Nevertheless, the appellant indicates that the DOH has experienced difficulty with the appellee for several

1. Pursuant to *W.Va.Code*, 16–5C–8 [1977], the appellant had an obligation to promptly investigate all complaints of alleged violations by the facility of all applicable requirements of state laws or regulations.

2. According to *W.Va.Code*, 16–5C–2(d) [1979], a "personal care home" is defined as:

any institution, residence or place, or any part or unit thereof, ... in this State which is advertised, offered, maintained or operated by the ownership or management, ... for the express or implied purpose of providing accommodations and personal assistance, for a period of more than twenty-four hours, to six or more persons who are dependent upon the services of others by reason of physical or

mental impairment but who do not require nursing care[.]

3. *W.Va.Code*, 16–5C–2(e) [1979] defines "nursing care" as the following:

those procedures commonly employed in providing for the physical, emotional and rehabilitational needs of the ill or otherwise incapacitated which require technical skills and knowledge beyond that which the untrained person possesses, including, but not limited to, such procedures as: Irrigations; catheterization; application of dressings; supervision of special diets; objective observation of changes in patient condition as a means of analyzing and determining nursing care required and the need for further medical diag-

years because she had accepted nursing patients for whom she was unqualified to care.

Since July 1, 1979, the Adkins Rest Home had been operating without a license in violation of *W. Va. Code*, 16–5C–6 [1977].[4] In 1984, the DOH sought closure of the facility based primarily on two converging factors. First, three employees at the rest home came forward with corroborating accounts of incidents of abuse and neglect which had occurred at the facility. Second, despite the repeated efforts of the DOH, the appellee continued to accept nursing care patients for whom she was unqualified to care.

On July 17, 1984, Dr. L. Clark Hansbarger, then the Director of the DOH, brought suit in the Circuit Court of Lincoln County on behalf of the department to enjoin the operation of the Adkins Rest Home on the grounds that the appellee had been operating a personal care home without a license, in violation of *W. Va. Code*, 16–5C–6 [1977], and had subjected the residents of the facility to abuse and/or neglect, in violation of *W. Va. Code*, 9–6–1, *et seq.*, as amended.[5] Based upon these allegations and several affidavits submitted in support thereof, the trial court issued a preliminary injunction closing the rest home and enjoining its further operation. The court also ordered

the residents of the facility transferred to a hospital for medical examinations and appointed a guardian ad litem to represent their interests.

On November 19, 1985, trial before an advisory jury was commenced regarding whether or not a permanent injunction closing the facility was warranted. During the trial, the DOH presented witnesses which testified as to various abuses practiced upon residents of the home as well as the fact that the home had operated as an unlicensed facility for a number of years.[6]

A detailed discussion of some of the specific abuses allegedly committed against the patients of the Adkins Rest Home is warranted in this case.

First, attendants at the Adkins Rest Home testified that the appellee would cut the patients' bedsores without anesthesia, indicating that, at times, the appellee would cut down to the bone. The attendants' corroborating testimony revealed that often the attendants themselves were called upon to restrain the elderly patients while the appellee would cut them.

A second abuse that the DOH alleges the appellee has practiced upon the patients in this facility concerns the use of catheters. Evidence at trial established that patients who did not medically require catheters

---

nosis and treatment; special procedure contributing to rehabilitation; administration of medication by any method ordered by a physician such as hypodermically, rectally, or orally and carrying out other treatments prescribed by a physician which involve a like level of complexity and skill in administration[.]

**4.** This code section requires a license to operate, *inter alia,* a nursing home or personal care home. In this proceeding, the DOH proved that the Adkins Rest Home had no license to operate as a personal care home since July 1, 1979. Moreover, there is no evidence in the record which demonstrates that the appellee at any time appealed the DOH's initial decision to deny license renewal after July 1, 1979. Thus, on that basis alone, the trial court should have granted the preliminary injunction requiring closure of the facility.

*W. Va. Code*, 16–5C–15(b) [1977], in pertinent part, instructs us that:

Should a person who is refused a license or the renewal of a license to operate or conduct a nursing home or personal care home or whose license to operate is revoked or who has been ordered to refrain from conduct or activity which violates the rules and regulations of the board of health, fail to appeal ... *then the court shall issue a permanent injunction upon proof that the person is operating or conducting a nursing home or personal care home without a license as required by law, ...* (emphasis added).

**5.** *W. Va. Code*, 9–6–1, *et seq.*, as amended, establishes social services for incapacitated adults.

**6.** Prior to the evolution of evidence surrounding illegal conduct concerning operations of the Adkins Rest Home, Dr. Hansbarger testified that the DOH was working with the facility in order to bring them in compliance with licensing standards pursuant to *W. Va. Code*, 16–5C–5 [1977].

would be catheterized by the appellant.[7] The attendants also testified that at the appellee's direction they retrieved discarded catheters from the trash, cleaned them and subsequently reused the catheters on other patients. The attendants stated that several patients received infections from the reused catheters and that routinely they found dark and bloodied urine in the catheters after they had been used by the patients.[8] Testimony elicited on behalf of Mrs. Adkins denied such activity occurred at the home.

Prior to the commencement of the appellee's trial, an *in camera* hearing was held regarding the testimony of Corporal Robert D. Estep, a senior polygraph examiner with the West Virginia Department of Public Safety. The purpose of this hearing was to establish certain admissions made by the appellee to Corporal Estep regarding her care of patients at the rest home. This witness' testimony revealed that he had administered a polygraph examination to the appellee. There have been no allegations that Mrs. Adkins was coerced into submission to the polygraph examination. During his testimony, the officer opined that the appellee had been untruthful when he had questioned her regarding her treatment of patients in the personal care home and specifically asked her if she had performed minor surgery on patients by cutting their bedsores and whether she had catheterized patients and subsequently reused the catheters in other patients.

Corporal Estep testified that after he had administered the examination to the appellee, he advised her that she had failed it.

A conversation ensued between Corporal Estep and Mrs. Adkins which reveals her admissions to specific allegations of abuse of which she had been accused by the DOH. The transcript of the *in camera* hearing reveals the following evidence which is undoubtedly critical to the appellant's case:[9]

Mr. Haight: Q. And, tell us, as well as you can recall, what the nature of that conversation was, what you said and/or what Mrs. Adkins said? What happened then?

Cpl. Estep: A. After completing the test, uh, I advised Mrs. Adkins that she had, in fact, failed the polygraph examination, that she was not truthful to me, that she was untruthful during the test, and I told her that, you know, try to make the best of a bad situation is the only thing I could say, and, uh—

Q. And, did you say that?

A. Yes, sir; I did, and, uh, then we started talking, and I asked her if she, in fact, uh, had she, uh, inserted catheters or taken out catheters, or anything of that nature?

Q. Did she respond to that question?

A. Yes, sir; she did.

Q. And what did she tell you?

A. She said that she had. I asked her "had she, in fact, give[n] shots when she was not authorized to do so, you know, other drugs and narcotics for the patients, you know, and she stated that she had. Uh, one in particular, I asked her had she used an instrument or scalpel at any time and made any cuts or incisions, or what would be deemed as minor sur-

---

**7.** Catheterization is specifically enumerated as a procedure requiring "nursing care" pursuant to *W.Va.Code*, 16–5C–2(e) [1979], which demands "technical skills and knowledge beyond that which an untrained person possesses, ..." Under *W.Va.Code*, 16–5C–2(d) and (e) [1979], a personal care home is not authorized to care for legitimately catheterized patients, because such patients require "nursing care" and should be in a "nursing home" rather than a "personal care home."

**8.** At trial, other numerous allegations of abuse were testified to by the DOH's witnesses including the insufficiency of meals prepared for the patients, unnecessary restraint of patients in

their chairs, the housing of at least one patient in a walk-in closet, the administration of prescription drugs and injections without a doctor's order by the appellee and the failure of the appellee to promptly summon a doctor for patients who became seriously ill. Witnesses on behalf of Mrs. Adkins deny these allegations.

**9.** We stress that the witness' testimony with regard to Mrs. Adkins' admission does not concern the results of her polygraph examination, but rather focuses on questions the witness asked the appellee and answers given by the appellee after the examination had been completed.

gery on any of the patients, and she related that some of the patients are there for long periods of time, and they get real, bad bedsores, and she would turn them over take a scalpel and cut out the rotten area on that sore, and, you know, in an effort the way she related to get the area to heal, you know, that was her—what she had stated....

....

Q. Did Mrs. Adkins in any of her conversation with you in connection with the cutting on the ulcers indicate how deep she cut?

A. Yes, sir.

Q. What did she say in that regard?

A. She said some of the areas that were rotten, you know, had to be cut way down almost to the bone.

The trial court then questioned Mrs. Adkins regarding her conversation with Corporal Estep following the administration of the polygraph examination.

THE COURT: Mrs. Adkins, you have been previously sworn in the case and have testified previously. The matters we are now speaking of relates to the events that occurred on June 27, 1984, at Company B Headquarters in South Charleston, wherein you were interviewed and subsequently run on a polygraph by Cpl. Estep, and thereafter had a further conversation with Cpl. Estep. The questions I am going to ask you, it has been indicated in this hearing you were asked the following questions:

You were asked "if you had ever inserted or removed catheters?" Cpl. Estep indicated your response was you had. Were you asked that question and did you make that response that he has indicated.

MRS. ADKINS: I said, "yes", but not—

THE COURT: (interposing) No, that's all. That's the extent of it. In other words, the question I have asked you called for a yes or no answer.

....

THE COURT: That's the first one. So, you admit that was done? I mean that you answered "yes".

MRS. ADKINS: Yes.

THE COURT: Now, the second question that is in issue here is whether or not you used an instrument or scalpel on any of the patients. Corporal Estep indicated your answer was "yes; that you had taken a scalpel and cut off rotten areas around the sore for the purpose of them healing." Did you make that answer?

MRS. ADKINS: Yes.

The DOH sought to proffer this testimony in the presence of the jury. The trial court, however, ruled that the evidence was inadmissible primarily because of the absence of specific written questions and answers documenting Corporal Estep's post-polygraph conversation with Mrs. Adkins.

At the close of the trial, the court submitted special interrogatories to an advisory jury empanelled to make recommendations concerning the factual issues involved in the case. The answers to the special interrogatories were generally favorable to Mrs. Adkins. By order dated March 3, 1986, the trial court adopted the special interrogatory answers returned by the advisory jury as part of its findings of fact. The trial court concluded that all of the evidence had failed to demonstrate a sufficient basis for injunctive relief against the appellee. The court ordered the temporary injunction dissolved and further ordered the appellant to process with all deliberate speed and fairness, the appellee's application for a renewal license.

The appellant then petitioned this Court for a stay of the circuit court's order which was subsequently granted pending this appeal.

II

The issue before this Court is whether, based upon the facts adduced at trial, there exists a sufficient basis on which to grant the appellant permanent injunctive relief pursuant to *W. Va. Code*, 16–5C–15(b) [1977], requiring closure of the facility.

■ Principally, the appellant contends that the trial court erroneously excluded Mrs. Adkins' post-polygraph admissions to

Corporal Estep regarding the improper conduct of which she had been accused. The appellant asserts that Mrs. Adkins' remarks to Corporal Estep following her polygraph examination were admissions against interest and should have been presented to the jury. We agree.[10]

Rule 801(d) of the *West Virginia Rules of Evidence* removes certain categories of evidence from the definition of hearsay, notwithstanding the fact that in each instance the category of evidence fits within the language of the hearsay definition found in *W.Va.R.Evid.* 801(c),[11] and allows such evidence to be admitted at trial. *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8.4, at 466 (2d ed. 1986).

Of particular relevance in the case before us is the provision of *W.Va.R.Evid.* 801(d)(2)(A) which states: "(d) *Statements Which are not Hearsay.*—A statement is not hearsay if—.... (2) *Admission by Party-Opponent.*—The statement is offered against a party and is (A) his [or her] own statement, in either his [or her] individual or a representative capacity, ..." Pursuant to this rule "admissions by a party-opponent are not within the hearsay rule at all and for this reason are admissible as substantive evidence unless some other exclusionary rule applies." F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8.5(A), at 469 (2d ed. 1986). *See* syl. pt. 4, *State v. Clark*, 175 W.Va. 58, 331 S.E.2d 496 (1985).[12]

The theory underlying this evidentiary rule is that if a person's own statements are offered against him, he cannot be heard to complain that he was denied an opportunity for cross-examination. An additional justification supporting the admissibility of

this class of evidence is the fact that it is inherently trustworthy. F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8.5(A), at 469 (2d ed. 1986). Presumably, a party would not admit or state anything against his or her interest unless it was true; nevertheless, if the statement is inaccurate, the party may deny it altogether or explain why he/she made it. *Id.*

The Supreme Court of the United States, in *United States v. Washington*, 431 U.S. 181, 186–87, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 244–45 (1977) recognized the inherent desirability of admissions of guilt. The Court noted, " '[The Constitution] does not preclude a witness from testifying voluntarily in matters which may incriminate him [or her]' *United States v. Monia*, 317 U.S. 424, 427 [63 S.Ct. 409, 410, 87 L.Ed. 376] (1943), for 'those competent and free-willed to do so may give evidence against the whole world, themselves included.' *United States v. Kimball*, 117 F. 156, 163 (CC SDNY 1902); ..."

Generally, this Court has determined that admissions made during pre-trial discovery may be introduced into evidence to prove the fact sought. *See, e.g., Anderson v. Turner*, 155 W.Va. 283, 297, 184 S.E.2d 304, 313 (1971); *Evans v. Farmer*, 148 W.Va. 142, 158–59, 133 S.E.2d 710, 719–20 (1963). Furthermore, in *Thornsbury v. Thornsbury*, 147 W.Va. 771, 131 S.E.2d 713 (1963), this Court determined that incriminating statements made by a party defendant to an officer investigating an automobile accident in which she was involved were admissible in evidence against the defendant as an extrajudicial admission.

---

**10.** We do not question the propriety of the trial court's exclusion of the results of the appellee's polygraph examination itself. Because of the polygraph's lack of general acceptance within the scientific community due to its inherent unreliability this Court has disfavored the admissibility of polygraph results. *See, e.g., State v. Gum*, 172 W.Va. 534, 545–46, 309 S.E.2d 32, 44 (1983); *see also* syl. pt. 2, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979).

**11.** *W.Va.R.Evid.* 801(d) was adopted verbatim from *Fed.R.Evid.* 801(d) and became effective

February 1, 1985. Thus, this rule was in effect during the appellee's trial in November, 1985.

**12.** Prior to adoption of *W.Va.R.Evid.* 801(d)(2)(A), this Court had held that "[a]ny statement made by a party ... which constitutes an admission against interest, and which tends to establish or to disprove any material fact in the case, is competent evidence against [the party]." Syl. pt. 2, *Thornsbury v. Thornsbury*, 147 W.Va. 771, 131 S.E.2d 713 (1963); *see also Arbogast v. Vandevander*, 161 W.Va. 731, 733 n. 3, 245 S.E.2d 620, 621 n. 3 (1978).

147 W.Va. at 779, 131 S.E.2d at 719, and the authorities cited therein.

■ As a general rule, confessions made after a polygraph examination are admissible as competent evidence provided there has been no coercive conduct procuring that confession nor a denial of the accused's constitutional rights. Annotation, *Admissibility in Evidence of Confession Made by Accused in Anticipation of, During, or Following Polygraph Examination*, 89 A.L.R.3d 230 § 2(b) (1979). *See also Grey v. State*, 273 Ind. 439, 404 N.E.2d 1348 (1980); *State v. Clifton*, 271 Or. 177, 531 P.2d 256 (1975); *Commonwealth v. Smith*, 317 Pa.Super. 118, 463 A.2d 1113 (1983).[13]

In the case before us, the trial court should have allowed the appellee's admissions concerning the cutting of bedsores and the insertion and reuse of catheters to be heard by the advisory jury. As we stressed earlier, admissibility of such evidence is favored because it is unlikely that a party would make a detrimental false statement. This being true, at the very least, the advisory jury should have been permitted to hear the evidence and weigh it in light of the other testimony and evidence adduced at trial. The information contained in the appellee's admissions to Corporal Estep was critical to the appellant's case. Undoubtedly, the admissions constituted relevant, material evidence which went to the heart of this case. Because the advisory jury's determination of the factual issues was ultimately adopted by the trial court, it was even more imperative that the appellee's admissions be heard by the jury.

■ Accordingly, we conclude that where a party, after having submitted to a polygraph examination, makes any statement constituting an admission against interest, such testimony is admissible at trial pursuant to *W.Va.R.Evid.* 801(d)(2)(A), provided that the admission was not procured by coercive conduct or a denial of the party's constitutional rights. Based on the foregoing, Mrs. Adkins' admissions to Corporal Estep concerning the operations at her personal care facility constituted competent evidence which was crucial to this case.

The trial court's exclusion of the statements of Mrs. Adkins was clearly erroneous, and a remand of this case is warranted.

By its nature, the function of the advisory jury is to enlighten the conscience of the trial court and the jury's verdict has no binding effect upon that court. The trial court may, of course, believe that the advisory verdict represents a correct result and make findings in accordance therewith.

(footnotes omitted). 5 J. Moore & J. Lucas *Moore's Federal Practice*, ¶ 39.10[3], at 39–39 (2d ed. 1986).

Recently, in a case procedurally similar to the one before us, the United States Court of Appeals for the Eleventh Circuit reversed and remanded a district court decision in which a trial judge erroneously excluded probative evidence from the advisory jury empanelled to hear the case. *Wilson v. City of Aliceville*, 779 F.2d 631 (11th Cir.1986).

In that case, a black police officer brought a discrimination action against a city for refusal to hire him as its chief of police. Because the suit was instituted under Title VII, there was no right to a jury trial, and the case was subsequently tried by the court with an advisory jury. The plaintiff sought to introduce into evidence the signed statement of a witness which revealed that the witness had overheard a mayor make a certain derogatory comment regarding race. In addition to excluding that written statement, that witness was not allowed to testify before the jury. The witness then testified out of the jury's presence, repeating the substance of the statement but without the racial invective she had referred to in her written statement. The appellate court narrowed the question to the trial court's failure to admit

---

**13.** We do not discuss the implication of the admissions of Mrs. Adkins in a criminal proceeding.

the statement of direct evidence of discrimination. The appellate court held that the trial court's action was clearly erroneous.

The advisory jury returned a verdict for the city which was affirmed by the trial court. In concluding that the evidence was erroneously excluded, the Court of Appeals noted that the plaintiff should have been permitted to challenge the witness' present testimony and to present her prior written statement. Pertinent language from that case follows:

> This case, however, was tried to an advisory rather than a regular jury. Federal Rule of Civil Procedure 39(c) allows a party to have a trial by jury although he is not entitled to one as a matter of right....
>
> As its name suggests, an advisory jury merely advises. Its findings of fact are not binding on the trial court. Indeed, the court is free to adopt its findings in whole or in part or to disregard them altogether. The ultimate responsibility for finding the facts remains with the court. Accordingly, review on appeal is from the judgment of the court as though no jury had been present. 5 Moore's Federal Practice, § 39–40 (2d ed. 1985).

(citations omitted). *Wilson v. City of Aliceville,* 779 F.2d at 635–36.

We believe the admissions of the appellee in the case now before us were highly probative to the appellant's case. It is apparent that the admissions were not considered by the trial court when it adopted the jury's findings of fact since the court concluded that such evidence need not be considered by the jury. *See Wilson v. City of Aliceville,* 779 F.2d 631 (11th Cir.1986). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *W.Va.R.Civ.P.* 52(a).

Accordingly, we are of the opinion that the record in this case discloses the existence of evidence decisive of the issues of law involved, which were omitted based on a misapprehension of the law. *See South Side Lumber Co. v. Stone Construction Co.,* 151 W.Va. 439, 152 S.E.2d 721 (1967); *see also* syl. pt. 2, *Cook v. Raleigh Lumber Co.,* 74 W.Va. 503, 82 S.E. 327 (1914).

Generally, the rules governing the powers of appellate courts in disposing of cases are applicable to the review of orders and decrees in injunction cases. 42 Am. Jur.2d *Injunctions* § 357 (1969). "Where the injunction decree is erroneous, the appellate court may remand the case to the lower court for further proceedings, and it may be that under the particular facts this is all it can do, or what it should do." (footnote omitted). *Id.*

This Court has held in syllabus point 2 of *South Side Lumber Co. v. Stone Construction Co.,* 151 W.Va. 439, 152 S.E.2d 721 (1967) that where a correct legal determination cannot be made because of the lack of an adequate record, we will remand the case: "When the record in an action or suit is such that an appellate court can not in justice determine the judgment that should be finally rendered, the case should be remanded to the trial court for further development." *See also* syllabus, *Wells v. City of Fairmont,* 173 W.Va. 519, 318 S.E.2d 463 (1984); syl. pt. 1, *White v. Bordenkircher,* 169 W.Va. 239, 286 S.E.2d 686 (1982).

For the foregoing reasons, the judgment of the Circuit Court of Lincoln County is reversed and remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.