417 S.E.2d 903

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Denzil DELANEY, Defendant Below, Appellant.**

No. 19837.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 1992.

Decided April 16, 1992.

Dissenting Opinion of Justice Neely June 1, 1992.

Joanna I. Tabit, Deputy Atty. Gen., Charleston, W.Va., for appellee.

Mark G. Sargent, Spencer, W.Va., for appellant.

BROTHERTON, Justice:

The appellant, Denzil Delaney, appeals from the verdict of the Circuit Court of Calhoun County, which found the appellant guilty on six counts of sexual assault. The appellant was sentenced to thirty-to-fifty years in the State penitentiary, fined $10,-000, and ordered to pay restitution for medical and counseling expenses incurred by the victims.

Denzil Delaney was married to Joyce Nicholas. He lived with his wife and their daughter, Patty, on a farm in Orma, Calhoun County, West Virginia. Also living with Denzil and Joyce Delaney were Joyce's parents and Joyce's two young sisters, Emma and Missy Nicholas.

The first of the alleged sexual assaults which form the basis of this case occurred in January, 1983, when the appellant assaulted seven-year-old Emma Nicholas after feeding the hogs. Later that summer, he again allegedly assaulted Emma while she was sleeping in her parents' bed. Next, in the summer of 1984, the appellant took Emma outside early one morning and again sexually assaulted her. He then gave her a handful of change and told her not to tell anyone.

In June, 1985, the appellant allegedly assaulted Emma's eight-year-old sister, Missy, while she was in her bedroom. Again, the appellant gave her a handful of change and told her not to tell anyone what he had done.

On July 21, 1985, Emma, Missy, and Patty Delaney, the appellant's daughter, told the appellant's wife, Joyce, that Denzil had been making them pull their clothes down. The appellant denied the allegation and accused the girls of lying. In July, 1988, Patty claimed that the appellant sexually assaulted her. A second sexual assault happened later that month. After both occasions, he gave her money and told her not to tell anyone.

After hearing that the appellant had molested Patty, Missy and Emma again decided to tell someone what had happened. Missy constructed a diary, in which she wrote, on July 18, 19, and 20, 1988, what had happened to her, Emma, and Patty. She also drew sketches of the appellant, portraying him as the devil. Missy placed the diary on the kitchen table on July 19, 1988, hoping that her mother, Missouri Nicholas, would read it. Her mother did not see it. Missy then copied one of the pages from the diary onto a separate piece

of paper and gave it to a friend to give to her mother. Word got back to Missy's older sister, Robin McCumbers, who told the appellant's wife what the girls had said. The appellant's wife, Joyce, then ordered the appellant to pack his clothes and leave. He moved to his mother's home in Pennsylvania.

On July 21, 1988, Joyce Delaney and Missouri Nicholas took the three girls to the State Police headquarters in Grantsville, where all three girls gave statements to Trooper Garrett. On July 22, 1988, they were examined by Dr. Kathryn Grant. Based upon the statements given, Trooper Garrett investigated the appellant and filed criminal complaints against him in Calhoun County Magistrate Court. The appellant waived extradition, returned to West Virginia, and was incarcerated in the Calhoun County jail.

While incarcerated, the appellant made several phone calls to Joyce, by then his ex-wife, and his ex-father-in-law, Denver Nicholas. Denver Nicholas visited the appellant at the jail at the appellant's request. At that time, the appellant allegedly confessed to sexually assaulting the three girls and indicated that, although he wanted to plead guilty, he was not permitted to do so because he was not represented by counsel at that time. During the next visit, Denver Nicholas reported that the appellant asked him to have the girls recant their statements, but Denver refused. When the appellant called his ex-wife, Joyce, she spoke with the appellant while her sister, Robin, listened on the extension. At that time, the appellant confessed that he had sexually assaulted the girls, but stated that he wanted the girls to lie because he didn't want to go to jail for it.

Trial began in the Circuit Court of Calhoun County on July 11, 1989. Denver Nicholas, Robin McCumbers, and Joyce Nicholas testified to the appellant's alleged confessions. Dr. Kathryn Grant, the physician who examined the three victims on July 22, 1988, also testified that Patty, the appellant's daughter, had physiological symptoms that were normal for a mature woman having sexual intercourse, but not

for a five-year-old girl. Dr. Grant also examined Missy and Emma, but the examination revealed no physiological indications of recent sexual intercourse. However, Dr. Grant stated that the physical signs of sexual intercourse could recede within as little as six months. Also testifying was Pamela Rockwell, a sexual assault counselor for the Charleston-based Family Services. Ms. Rockwell had counseled Missy, Emma, and Patty on several occasions prior to trial. Ms. Rockwell testified that the three girls displayed symptoms of children who had been sexually assaulted or abused.

Following the closing statements, the jury found the appellant guilty on all six counts. Accordingly, the trial court sentenced him to thirty-to-fifty years in the State penitentiary, fined him $10,000, and ordered him to pay for the medical and counseling expenses incurred by the three girls. It is from the conviction that the appellant files this appeal.

The appellant presents twenty-four separate allegations of error to this Court for review. This Court will address only those assignments of error which have some substance and merit discussion. The remaining assignments of error, which we believe to be meritless, will not be addressed in this opinion.

■ Initially, we note that the appellant's argument that he had ineffective assistance of counsel at the trial level is erroneous. A review of the transcript reveals that the appellant's trial counsel, who is also his appellate counsel, did all things reasonable and necessary to defend his client. In *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1973), this Court set the standards for determining ineffective assistance of counsel:

> Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interest, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.

*Id.* at syl. pt. 21. Further, the *Thomas* Court ruled that "[o]ne who charges on

appeal that his trial counsel was ineffective and that such resulted in his conviction, must prove the allegation by a preponderance of the evidence." *Id.* at syl. pt. 22. As we can find no evidence that the trial counsel's performance resulted in the appellant's conviction or that no reasonably qualified defense attorney would have so acted, we do not find ineffective assistance of counsel.

■ The appellant next argues that the trial court erred when it allowed Joyce Nicholas, the appellant's ex-wife, to testify regarding his acts and statements which occurred while they were still married. The appellant argues that his ex-wife's testimony should have been limited to acts alleged to have been committed against their daughter, Patty, and that the marital privilege would prevent her from testifying regarding Emma and Missy.

West Virginia Code § 57–3–3 (1931) explains the marital privilege against acting as a witness against a spouse:

> In criminal cases husband and wife shall be allowed, and, subject to the rules of evidence governing other witnesses, may be compelled to testify in behalf of each other, but neither shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other *except in the case of a prosecution for an offense committed by one* against the other, or *against the child,* father, mother, *sister* or brother *of either of them....* (Emphasis added.)

In this case, the charged sexual assaults were against their child and against the wife's two younger sisters. Thus, the marital privilege is not applicable to this case by the specific language of W.Va.Code § 57–3–3.

■ The appellant next argues that the statements made by him to Denver and Joyce Nicholas while in jail were hearsay and thus, should have been held inadmissible by the court below. We disagree. Rule 801(d)(2)(A) of the West Virginia Rules of Evidence holds that admissions by a party opponent do not fall within the

hearsay rule. In syllabus point 1 of *Heydinger v. Adkins,* 178 W.Va. 463, 360 S.E.2d 240 (1987), this Court stated that "[a] statement is not hearsay if the statement is offered against a party and is his own statement, in either his individual or representative capacity." We believe the statements were properly admitted by the trial court.

The appellant next contends that his constitutional right to due process was violated when the Circuit Court of Calhoun County denied his request to order court appointed experts access to the victims for physical and psychological examinations. The appellant was permitted both medical and psychological experts to interpret the examinations that had already been performed upon the three girls, but denied the opportunity to have the three girls reexamined by another physician and psychologist.

■ While we agree that a defendant has a right to present evidence on his own behalf and to confront adverse witnesses, pretrial discovery is generally within the discretion of the trial court. Syl. pt. 8, *State v. Audia,* 171 W.Va. 568, 301 S.E.2d 199 (1983); *see also, State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989). This Court has held that the decision whether to require a psychiatric evaluation prior to determining a child's capacity to testify is within the trial court's discretion. *Burdette v. Lobban,* 174 W.Va. 120, 323 S.E.2d 601, 602 (1984). However, the Court has also ruled that "the traditional challenge to the competency of minors ... does not require a psychological profile." *State v. McPherson,* 179 W.Va. 612, 371 S.E.2d 333, 339–40 (1988).

The State counters that the court must balance the defendant's right to discover possible evidence against the victims' privacy interests in ordering another physical examination. The State urges this Court to adopt a balancing test in order to determine whether additional examinations would be required, pointing to the test developed in *State v. Ramos,* 553 A.2d 1059 (R.I.1989).[1] In *Ramos,* the Supreme Court

---

**1.** Other jurisdictions have adopted some form of

the "compelling need or reason" test in deter-

of Rhode Island adopted "a compelling need or reason" test, stating that:

> The practice of granting physical examinations of criminal witnesses must be approached with utmost judicial restraint and respect for an individual's dignity. In determining whether to order an independent medical examination, the trial justice should consider (1) the complainant's age, (2) the remoteness in time of the alleged criminal incident to the proposed examination, (3) the degree of intrusiveness and humiliation associated with the procedures, (4) the potentially debilitating physical effects of such an examination, and (5) any other relevant considerations.

*Id.* at 1062.

Although less specific than the *Ramos* test, Alaska utilizes a similar balancing test in determining whether the trial court was correct. In *Moor v. State,* 709 P.2d 498 (Alaska App.1985), the Alaska Court of Appeals required a strong showing of materiality on the part of the requesting party before it would reverse a trial court's decision not to grant a psychiatric evaluation of a prosecution witness. *Id.* at 508. In making the decision, the court weighed the defendant's right to a fair trial and to challenge the veracity of the prosecution witnesses against the witness' right to privacy and the risk that such crimes would go unreported if witnesses were subject to harassment. *Id.* The Alaska court concluded that the defendant's offer of proof was inadequate and the trial court's denial of the evaluation would be upheld where the defendant's evidence showed the victim had discussed possible imaginary sexual activity with friends.

We believe the guidelines established in *Ramos* are a reasonable method of balancing the defendant's need for the examinations against the victim's right to privacy. Thus, in order for a trial court to determine whether to grant a party's request for additional physical or psychological examinations, the requesting party must present the judge with evidence he has a compelling need or reason for the additional physical or psychological examinations. In making the determination, the judge should consider (1) the nature of the examination requested and the intrusiveness inherent in that examination; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in time of the examination to the alleged criminal act; and (6) the evidence already available for the defendant's use.

Although the trial court below does not state specific and detailed reasons for denying the request, we believe that it followed, in essence, the test enunciated in *Ramos*. In light of the victims' tender ages, the intrusiveness and humiliation associated with a gynecological examination of the three young girls, and the remoteness in time from the incidents in question to the proposed examinations, the court was correct in denying the request for a physical examination. Most persuasive to this Court is the fact that the State's expert testified that physical symptoms of sexual assault can dissipate in as little as six months. It has been several years since the dates of the alleged assaults. Thus, any evidence the appellant hopes to obtain from these tests would have long

mining whether a request for an additional physical examination should be granted. *See People v. Chard,* 808 P.2d 351 (Colo.1991), *cert. denied* ── U.S. ──, 112 S.Ct. 186, 116 L.Ed.2d 147 (1991); *State v. Farr,* 558 So.2d 437 (Fla.App.1990); *State v. Drab,* 546 So.2d 54 (Fla.App.1989); *People v. Beauchamp,* 126 Misc.2d 754, 483 N.Y.S.2d 946 (N.Y.Supp.1985); *Lanton v. State,* 456 So.2d 873 (Ala.Crim.App.1984), *cert. denied* 471 U.S. 1095, 105 S.Ct. 2314, 85 L.Ed.2d 834 (1985); *People v. Glover,* 49 Ill.2d 78, 273 N.E.2d 367 (1971).

A balancing test has also been applied in cases in which psychological testing was requested. *See People v. Chard,* 808 P.2d 351 (Colo.1991); *State v. LeBlanc,* 558 So.2d 507 (Fla.App.1990); *State v. Nelson,* 235 Neb. 15, 453 N.W.2d 454 (1990); *People v. Graham,* 173 Mich.App. 473, 434 N.W.2d 165 (1988); *Moor v. State,* 709 P.2d 498 (Alaska App.1985); *State v. Filson,* 101 Idaho 381, 613 P.2d 938 (1982).

ago disappeared. In balancing the appellant's need against the consideration of the victims' ages, the intrusiveness of the examinations, and the remoteness of time, we conclude that there would be no probative value of such physical examinations at this point. Thus, the trial court was correct in denying additional physical examinations of the three victims.

■ The appellant's request for a psychological evaluation likewise fails. In many cases with similar circumstances, the trial court would be justified in allowing the examination. In this case, however, despite the appellant's professed need, he did little more than ask for the evaluation. Under the six part test set forth above, the appellant failed to present any reason, compelling or otherwise, to justify the examination. Given the effect of a probing mental interrogation on children of their tender years, we believe the trial court was correct in ruling that, in essence, the probative value to the appellant was outweighed by the trauma and intrusiveness to the victims. The appellant had available to him a psychologist to assist with the evaluation and cross-examination of the State's expert testimony. The appellant's counsel cross-examined the State's witness extensively on perceived failures in her treatment and questioning of the children's background.[2] Since we cannot find that the appellant's need is greater or more compelling than the burden it would impose on the victims,

the trial court did not abuse its discretion in denying the appellant's request.[3]

The appellant's remaining assignments of error are without merit and are not addressed by the Court in this opinion. Accordingly, we affirm the verdict of the Circuit Court of Calhoun County.

Affirmed.

NEELY, Justice, dissenting:

I agree with the majority that the defendant is a mean and nasty fellow who has committed incredibly reprehensible acts and that the defendant should be locked up and the key to his cell thrown away. However, as I have noted before, when courts decide easy cases such as this one, they often make bad law. *See Charlton v. Charlton*, 186 W.Va. 670, 413 S.E.2d 911 (1991) (Neely, J., dissenting). In its holding today, the majority makes two mistakes: it reiterates the error made when Syllabus Point 7 of *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990) became law and it compounds that error by not giving the defendant a presumptive right to a psychological examination of the alleged victim when the prosecution presents evidence of its own examination. Therefore, I must dissent.[1]

In syllabus point 7 of *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), this Court held:

Expert psychological testimony is permissible in cases involving incidents of child sexual abuse and an expert may

---

2. Ms. Rockwell qualified as an expert at trial. She testified that she had a bachelors degree with fifteen hours toward her masters degree and approximately ninety hours of continuing education specializing in childhood sexual abuse. At the time of trial, she had been employed by the Sexual Assault Program at the Charleston-based Family Services for five and one-half years and in social services for another two years. She testified that she had treated approximately 400–450 children as victims of sexual assault, with ages ranging from three years through teenagers. Ms. Rockwell also stated that she received training in California, Chicago, and Washington, D.C. No objection was made by the appellant's counsel at the time of her testimony.

3. We also note the appellant's argument that the testimony of the rape counselor expert was im-

proper is erroneous. In syllabus point 7 of *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), this Court held that:

Expert psychological testimony is permissible in cases involving incidents of child sexual abuse. An expert may state an opinion as to whether the child comports with the psychological and behavioral profile of a child sexual abuse victim, and may offer an opinion based on objective findings that the child has been sexually abused....

As a result, we believe that the testimony of Ms. Rockwell was proper.

1. I agree with the majority that the balancing test it presents is appropriate for incredibly intrusive physical examinations, especially when the physical evidence is otherwise available for the defendant's expert to examine.

state an opinion as to whether the child comports with the psychological and behavioral profile of a child sexual abuse victim, and may offer an opinion based on objective findings that the child has been sexually abused. Such an expert may not give an opinion as to whether he personally believes the child, nor an opinion as to whether the sexual assault was committed by the defendant, as these would improperly and prejudicially invade the province of the jury.

I disagreed with that decision and joined Justice Miller in his learned and well-reasoned dissent.

The testimony in this case is also similar to that which we sanctioned in *State v. McCoy,* 179 W.Va. 223, 366 S.E.2d 731 (1988). Although I do not think we should overrule our decision in *McCoy,* more and more I have come to understand that now fully too much unfairly prejudicial testimony is admitted under the banner of *McCoy.* In *McCoy,* we glossed over the important question of the reliability of this type of testimony. In a footnote we dismissed the use of the *Frye* test, but then we failed to examine thoroughly the reliability of so-called "expert" testimony. One problem is that the counselors who testify often are "treating" rather than "diagnosing." For instance, the counselor who first sees a child who may have been sexually abused does not inundate that child with difficult questions. Quite properly, the counselor does not want to intimidate the very child she is seeking to help. As proper as this technique is for therapy, it is not the appropriate avenue for objective diagnosis. Because *Edward Charles L.* and *McCoy* are now the law in West Virginia we should at least allow a defendant the opportunity to have his own psychological expert examine the alleged victim if the prosecution is allowed to use any of its "expert" psychological testimony at trial.

The majority treats "expert" psychological testimony about the deeply shrouded recesses of the mind the same way it would treat testimony by medical doctors about broken legs and pulled muscles. Who are they kidding? That is like treating Little League the same as the National League. Examining the two sets of testimony (physical and psychological) offered in this case is instructive.

Dr. Kathryn Grant, a medical doctor with four years of college education, four years of medical school education, and an internship, testified about her physical examinations of the victims. Dr. Grant testified about specific objective physical findings.

On the other hand, the "expert psychological" testimony was provided by Ms. Pamela Rockwell, a sexual assault counselor with a bachelor's degree. Ms. Rockwell testified from her meetings with the victims that their behavior was consistent with having been sexually assaulted. *However, she did not inquire into the children's backgrounds concerning other possible causes for their behavior; she did not talk to their teachers; and she did not talk to anyone who knew them before the assaults. She also testified that in her line of work she is basically an advocate for victims.* This is ridiculous![2]

Under the sanction of *Edward Charles L.,* the circuit court admitted testimony by a woman who admits that she is not neutral. Further, she is not a trained psychologist or psychiatrist. And, she did not ask basic questions that one would think any competent person (not just an expert) would ask if that person really were interested in finding the *truth* instead of advancing a cause.

The majority today exacerbates the blunder of *Edward Charles L.* by placing its stamp of approval on the testimony by Ms. Rockwell. It appears that we will now allow testimony in court by someone with an entry level degree about complicated subjects that we require people to study for *years* in school before they can become clinically qualified to practice when the area is controlled by a peer-review licensing board. Although I understand that

---

**2.** From reviewing scores of rape and sexual abuse cases, I can aver without the least fear of contradiction that the so-called rape-trauma experts who testify in criminal cases in this State could not be less credible if they wore bones in their noses and prognosticated by throwing colored stones.

there are some areas in which people do not need advanced degrees to be experts,[3] psychology is not one of them. The majority, however, is more enthusiastic about pseudo-science than proven scientific and technical testimony. Consider, for example, the reserved enthusiasm for the testimony by Trooper Miller (with pages of evidence about his expertise in accident reconstruction)[4] in *State v. Hose*, slip op. 20514, 1992 WL 113557 (filed May 28, 1992) compared to the endorsement of Ms. Rockwell's testimony in this case. In this case, the only rationale for the prosecution's choosing Ms. Rockwell is that she was not neutral and was prepared to offer testimony favorable to the prosecution.

In some cases the prosecution does offer expert psychological testimony by a *credentialed* expert. In these cases too, I disagree with the majority. The sciences of the mind are still much less exact than the sciences of the body and therefore any psychological findings must be subjected to rigorous examination. This does not just mean cross-examination of an expert, but equal time for the defendant's expert. What less could fairness and due process require?

I will not lose any sleep tonight because Mr. Delaney remains in jail, but the test set up by the majority in syllabus point 3 creates the possibility that not only guilty people like Mr. Delaney, but truly innocent people will be convicted by pseudo-science and outright witchcraft masquerading as science.

---

**3.** I suspect that a mechanic could testify as knowledgeably about brake failure in an automobile as could someone with an engineering degree from MIT.

**4.** In *State v. Hose*, slip op. 20514, 1992 WL 113557 (filed May 28, 1992) this Court said:

In the present case, Trooper Miller testified at some length regarding his background and experience in accident reconstruction. He essentially testified that he had had forty hours in basic accident investigation at the West Virginia State Police Academy, that he had had eighty hours of advanced accident investigation at the University of North Florida, that he had had eighty hours of technical accident investigation at Northwestern University, that he had had an eighty-hour accident reconstruction class at the University of North Florida, that he had taken forty hours of accident photography at the West Virginia State Police Academy, and that, in effect, he had had some 320 hours of instruction in areas related to accident investigation. He also testified that he was a member of the Society of Accident Reconstructionists, that he had personally handled over 600 accidents, and that he had worked with the National Transportation Safety Board on accident investigation. He further stated that he had investigated a number of tractor trailer accidents.

Overall, there is substantial evidence indicating that Trooper Miller had been previously involved in accident investigations involving tractor trailers and that he had basic training which would to some degree equip him for accident investigation and reconstruction. *Given these circumstances and Trooper Miller's background, this Court cannot say that the trial court's allowing him to testify as an expert witness constituted an abuse of the trial court's sound discretion or that the trial court's decision was clearly wrong in that matter.* [Emphasis added]