423 S.E.2d 222

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Chester Andrew WALTER, Defendant Below, Appellant.**

**No. 21146.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1992.

Decided Oct. 9, 1992.

Concurring Opinion of Justice Neely Oct. 20, 1992.

---

Steven L. Miller, Deborah E. Reed, Miller & Reed, Cross Lanes, for appellant.

Mario J. Palumbo, Atty. Gen., Silas B. Taylor, Senior Deputy Atty. Gen., Charleston, for appellee.

## PER CURIAM:

The appellant, Chester Andrew Walter, was convicted of sexual abuse in the first degree, sexual assault in the first degree, and incest on September 21, 1990. All charges involved his four-year-old son, Timothy Walter.

During post-trial motions for judgment notwithstanding the verdict or a new trial, the assistant prosecuting attorney who tried the case conceded on the record that the State's evidence was wholly insufficient to convict on the second and third counts of the indictment, which alleged first-degree sexual assault and incest. Although the trial judge requested that the prosecution join the defense and prepare a written motion to dismiss these two counts, this apparently did not happen.

Consequently, the State now confesses error on these two charges, admitting that "there is no evidence in the record to support the element of sexual intrusion necessary to each of said counts."[1] The defen-

---

1. According to W.Va.Code § 61–8B–3(a) (1989), a person is guilty of first-degree sexual assault when:

> (1) Such person engages in sexual intercourse or sexual intrusion with another person and, in so doing:
> (i) Inflicts serious bodily injury upon anyone; or

> (ii) Employs a deadly weapon in the commission of the act; or
> (2) Such person, being fourteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is eleven years old or less.

West Virginia Code § 61–8–12(b) (1989) states that "[a] person is guilty of incest when such person engages in sexual intercourse or sexual

dant argues that there is also insufficient evidence to sustain his conviction on the remaining charge of first-degree sexual abuse.

The alleged abuse in this case occurred sometime during the period from April, 1989, to July, 1989, when Amy Walter states that she began working outside the home sixteen hours a day. Her husband, the defendant, cared for their two young sons, Timmy, then three, and Dustin, age two. According to Amy, it was during this time that the boys began exhibiting unusual behavior. She "found both boys in the bathtub, one giving oral sex to the other," and "they were having a few nightmares. They'd wake up screaming."

The defendant and his wife separated for the final time on August 5, 1989. He had filed for divorce earlier in this marriage, but they later reconciled and had their second son. Amy states that the boys' nightmares continued, and on one occasion she found them "practicing sex" on each other. She also felt that the boys demonstrated a fear of their father.

When Amy applied for welfare benefits, she was referred to the Child Advocate Office and then to Child Protective Services, who referred the children to Pam Rockwell, a private sexual assault counselor. In her deposition testimony, Rockwell states that she met with both boys for the first time for about an hour on September 13, 1989. A second interview with both boys took place on September 20, 1989, and a third on January 8, 1990. The fourth interview on February 13, 1990, marked the first time that she saw Timmy alone. The next interview with Timmy occurred three

months later on May 13, 1990, and the last interview took place on June 26, 1990.

The defense maintains that Pam Rockwell's testimony was the only evidence in the case from which the jury could have inferred that any sexual contact with Timothy Walter had occurred or that the defendant had engaged in such activity or that it had been done for purposes of sexual gratification of the defendant or the child. According to the defense, there was absolutely no evidence whatsoever of sexual intercourse, sexual intrusion, or even the slightest degree of penetration. For this reason, the defense made pre-trial motions in limine to exclude Rockwell's hearsay testimony. However, the testimony was admitted over defense objection as "statements made by Timothy Walter for the purpose of obtaining medical treatment."

On appeal, the defense argues that the defendant was entitled to a directed verdict or a new trial on the first-degree sexual abuse charge. The defense argues that the State failed to prove that the defendant was over fourteen years of age or that the alleged touching of Timmy was for the purpose of gratifying the sexual desires of either the defendant or the alleged victim.[2] Further, the defense contends that the State's sole evidence of the requisite "sexual contact" is Rockwell's hearsay testimony, and that even if this testimony is admissible, it is insufficient to support a conviction for first-degree sexual abuse.

At trial, Assistant Prosecuting Attorney Mark Sorsaia was arguing the issue of the admissibility of Rockwell's testimony when he told the judge that because four-year-old

---

intrusion with his or her father, mother, brother, sister, daughter, son, grandfather, grandmother, grandson, granddaughter, nephew, niece, uncle or aunt."

**2.** West Virginia Code § 61–8B–7(a) (1989) provides that "[a] person is guilty of sexual abuse in the first degree when:

(1) Such person subjects another person to *sexual contact* without their consent, and the lack of consent results from forcible compulsion; or

(2) Such person subjects another person to sexual contact who is physically helpless; or

(3) Such person, being fourteen years old or more, subjects another person to sexual contact who is eleven years old or less."

(Emphasis added.) In this case, "sexual contact" was defined for the jury by State's Instruction 2, which stated that:

As used by the Court in this case, *sexual contact means* any *intentional touching*, either directly or through clothing, of any part *of the sex organs* of another person, or intentional touching of any part of another person's body by the actor's sex organs, *where the* victim is not married to the person and *the touching is done for the purpose of gratifying the sexual desire of either party.*

Timmy was unable to testify, and because he had decided not to use a videotaped interview of Timmy which was conducted by a State police officer, Rockwell's testimony "will be *the only direct evidence I have* that the Defendant molested this child.... *You know, Pam Rockwell is my case, Your Honor.*" (Emphasis added.)

As we noted above, the State confesses error on two of the three convictions that it obtained in this case, those for first-degree sexual assault and incest. In the syllabus of *State v. Goff,* 159 W.Va. 348, 221 S.E.2d 891 (1976), we stated that:

> In a criminal case where the state confesses error, urges that the judgment be reversed and that the defendant be granted a new trial, this Court, upon ascertaining that the errors confessed are reversible errors and do in fact constitute cause for the reversal of the judgment of conviction, will reverse the judgment and grant the defendant a new trial.

More recently, in *State v. Julius,* 185 W.Va. 422, 433 n. 14, 408 S.E.2d 1, 12 n. 14 (1991), we clarified our position by noting that "sometimes ... the State's confession of error will not result in a complete reversal of the case." "This Court is not obligated to accept the State's confession of error in a criminal case. We will do so when, after a proper analysis, we believe error occurred." Syl. pt. 8, *State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991).

The case now before us is one which clearly merits reversal. The State admits that there was absolutely no evidence of sexual intercourse or intrusion, and such evidence is a necessary element of both first-degree sexual assault and incest. The defendant was convicted in spite of the fact that these charges required proof of a specific degree of sexual contact

which quite obviously did not exist, and he was undoubtedly prejudiced by the cumulative effect of the two erroneously obtained convictions. It is impossible to discern the degree to which these two convictions infected the only remaining charge for first-degree sexual abuse, or to ascertain precisely upon what evidence the jury based this conviction.

Accordingly, as a result of the State's confession of error and our determination that such error did occur, we reverse the judgment of the Circuit Court of Putnam County on the defendant's convictions of first-degree sexual assault and incest. The judgment is also reversed as to the defendant's conviction for first-degree sexual abuse, and this case is remanded for a new trial.

Reversed and remanded; new trial awarded.

NEELY, Justice, concurring:

This case is just one more example of the dangers of lowering the standards of proof because we "know" that the defendant "must" be guilty. The prosecution has been caught up in prosecuting the latest crime of fashion: sexual abuse of one's own children. *See State ex. rel. Spaulding v. Watt,* 188 W.Va. 124, 423 S.E.2d 217 (Neely, J., dissenting); *State v. Delaney,* 187 W.Va. 212, 417 S.E.2d 903 (1992) (Neely, J., dissenting). Here, the prosecutor admitted that he did not have the evidence to sustain the convictions, and that "Pam Rockwell is my case." [1] Today, this Court has finally seen fit to take a stand against the witch hunt which has been driven, at least in part, by hostile divorce proceedings.

Pamela Rockwell,[2] the prosecution's entire case, testified to the ultimate fact at

---

1. Trial transcript at 213.

2. We have dealt with Ms. Rockwell before as an expert on several occasions. Each time we have been significantly underwhelmed by her methods, techniques and biased perspective:

> On the other hand, the "expert psychological" testimony was provided by Ms. Pamela Rockwell, a sexual assault counselor with a bachelor's degree. Ms. Rockwell testified from her

meetings with the victims that their behavior was consistent with having been sexually assaulted. However, she did not inquire into the children's backgrounds concerning other possible causes for their behavior; she did not talk to their teachers; and she did not talk to anyone who knew them before the assaults. She also testified that in her line of work she

issue in this case: she testified that Mr. Walter abused his child, Timmy. She testified to this after a couple of meetings with the child. The child apparently was unable to tell anybody what, if anything, occurred. If the victim (a child of four) cannot testify competently, how can Pamela Rockwell, (short of having a bone in her nose and tossing colored stones) testify to the ultimate fact merely by interviewing that very same child? Such unreliable evidence has become the fuel that drives our system towards conviction of the innocent. This may occur in two ways: a jury may convict as it did in this case, on woefully incompetent and traditionally inadmissible evidence; or, the accused may be so terrorized by the totally stacked deck from which his judicial cards are about to be drawn that he pleads guilty.

Just as we have concerns about physical science, and the reliability of "scientific" tests which tend to prove the ultimate question for the jury, we have even more anxiety about psychological tests, particularly when they are conducted by witch doctors rather than regular doctors. In *State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989), we held:

Certainly a test clothed with all the trappings of science, but which is not scientifically accepted, is more misleading or prejudicial than it is probative. Pseudoscience is more dangerous than no science at all.

*Woodall*, 182 W.Va. at 21–22, 385 S.E.2d at 259. Our general concerns in admitting "scientific" testimony are whether the "test" itself is inherently reliable and whether both sides receive full and fair opportunities to examine all of the evidence that the expert used to draw the conclusions presented at trial.[3] *State v. Thomas*, 187 W.Va. 686, 690–92, 421 S.E.2d 227, 231–33 (1992). The same pseudo-science problem also exists when "expert" *psychological* testimony is used to implicate a defendant. The courts must make sure that the techniques used are reliable, that there is credible support for the assertions made, and that the defense has a full opportunity to examine all sources of information used by the prosecution's expert.

In this case, Pamela Rockwell's testimony appears to be the ultimate in pseudoscience. Despite its apparent unreliability, Pamela Rockwell's hearsay testimony was admitted into evidence because the circuit court considered it a "statement for the purpose of medical treatment."[4] Howev-

is basically an advocate for victims. This is ridiculous! [Emphasis original]
*State v. Delaney*, 187 W.Va. 212, 218, 417 S.E.2d 903, 909 (1992) (Neely, J., dissenting).
Pamela Rockwell's testimony in this trial has served to reinforce my conclusion that "the so-called rape-trauma experts who testify in criminal cases in this State could not be less credible if they wore bones in their noses and prognosticated by throwing colored stones." *Delaney*, 187 W.Va. 212, 218 note 2, 417 S.E.2d 903, 909 note 2 (Neely, J., dissenting).

3. As we noted in *State v. Thomas*:
    Cross-examination is the engine of truth; in order for evidence of scientific tests to be considered reliable by the courts, the tests must be subject to the fullest cross-examination possible.... This is a problem of the first order: should it be present in a criminal trial, pseudo-science is eminently convincing because it is accompanied by all the mumbo-jumbo of real science.
*Thomas*, 187 W.Va. 686, 691, 421 S.E.2d 227, 232 (1992).

4. Apparently, portions of Ms. Rockwell's testimony were admitted on the grounds that Ms. Rockwell was an expert under *W.Va.Rule of*

*Evidence* 702, and other portions of her testimony were admitted under the hearsay exception contained in *W.Va.Rule of Evidence* 803(4) for:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

However, to be admitted, the evidence still must pass the general burden of being more probative than prejudicial under Rule 403. To meet that burden, the testimony must have internal indicia of reliability. Normally, we assume that when one talks to a doctor for purposes of treatment that one is telling the truth so the doctor can properly treat the injury. However, in situations such as this *where the primary purpose of the examination is to prepare for trial*, we must examine the statement to make sure that there are significant indicia of reliability within the statement itself due to the lack of significant consequences for an incomplete or incorrect disclosure. This standard needs to be met for Pamela Rockwell's hearsay testimony to be admissible. *See Idaho v.*

er, it is clear that Pamela Rockwell's primary function was to prepare testimony for court, not to give any medical treatment. Furthermore, Ms. Rockwell apparently embellished her tales to the point of convincing the jury to convict Mr. Walter of first-degree sexual assault and first-degree sexual abuse, counts which are *directly contradicted by the physical evidence.*[5]

Ms. Rockwell's assertions appear to have been totally without support; and because Ms. Rockwell was the prosecution's "entire case," there was no evidence to convict Mr. Walter. Accordingly, justice demands that we overturn the conviction and remand the case to the circuit court for a judgment of acquittal under *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

In *Burks,* the U.S. Supreme Court held:

[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, [therefore] the only 'just' remedy available for that court is the direction of a judgment of acquittal.

*Burks,* 437 U.S. at 18, 98 S.Ct. at 2150. Furthermore, the circuit court should not be inhibited by the fact that Mr. Walter moved for a new trial:

[I]t makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person "waives" his right to a judgment of acquittal by moving for a new trial.

*Burks,* 437 U.S. at 17, 98 S.Ct. at 2150.

Once already, the State presented the circuit court with a wholly insufficient case against Mr. Walter. The prosecutor pursued this case only because of the mass hysteria surrounding allegations of this particular crime of fashion. It would clearly place Mr. Walter in double jeopardy to allow the State to attempt to prove the case that it already has failed to prove. This case is just one of many similar child sexual abuse prosecutions that have been brought in Putnam County. It certainly appears as if a witch hunt is taking place, only this time the charge is child sexual abuse instead of sorcery. Putnam County is not unique; statewide and nationwide, we have seen a disturbing trend towards an increase in this type of unsubstantiated charge. The mere accusation of sexual abuse instantaneously produces a stain that mars the reputation of the accused irrespective of whether the accused committed the offense. There is no way to disprove the accusation to the complete satisfaction of the public. Yet often, the charges merely stem from people trying to obtain leverage in bitter divorce proceedings and custody battles.[6]

It is time for prosecutors to start thinking seriously about raising the standards for the cases they bring, and the courts must work to ensure that the evidence

---

*Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

5. After the close of the trial (but before the sentencing), Mr. Sorsaia, the prosecutor, told the circuit court:
   I can't in good faith stand here in front of the Court and argue that there is evidence on the record to support incest and assault.
   Transcript of post-trial motions on 10 October 1990 and 4 February 1991, at 8. Mr. Sorsaia's reasoning was based on the lack of physical evidence to support the counts:
   After my recollection of what happened at the trial, Your Honor, I'm not aware of any evidence of penetration. And State takes the position, Your Honor, we don't oppose the dismissal of Counts 2 and 3 based on that....

Based upon my recollection, my good faith recollection, Your Honor, I can't say that there was any evidence of penetration in the record.
Transcript of post-trial motions on 10 October 1990 and 4 February 1991, at 14. The lawyers for both sides agree, and a reading of the record confirms, that there was absolutely no evidence to support the conviction on the count of incest, nor was there any evidence to support the conviction on the count of sexual assault.

6. It is abundantly clear from the record that there was an acrimonious divorce and custody battle between Amy Walter and Chester Walter being waged during this criminal prosecution.

brought before them is reliable and proba- tive before admitting the evidence or sub- mitting the case to the jury. Increasing convictions at the expense of justice serves · no legitimate end! Such convictions are simply a type of political theater more wor- thy of China in the 1960's than of the United States in the 1990's.