475 S.E.2d 1

**MARY ANN P., Plaintiff Below, Appellant,**

v.

**WILLIAM R.P., Jr., Defendant Below, Appellee.**

No. 22959.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 16, 1996.

Decided Feb. 29, 1996.

Concurring Opinion by Justice Workman filed July 19, 1996.

Mary M. Downey, Charleston, for Appellant.

Wayne King, Clay, for Appellee.

PER CURIAM.

Mary Ann P.,[1] the plaintiff below and appellant herein, appeals an order of the Circuit Court of Kanawha County which granted William R.P., Jr., the defendant below and appellee herein, supervised visitation with the couple's two sons. The plaintiff argues the circuit court erred when it failed to find credible evidence of sexual abuse and failed to appropriately consider the evidence that the defendant physically and mentally abused her. After reviewing the record, we find that even if no sexual abuse occurred in this case, the circuit court erred when it failed to take into consideration the defendant's abusive behavior toward the plaintiff and the emotional impact that abuse had on their children. The weight of the evidence supports our conclusion to remand this case to the circuit court with directions to suspend supervised visitation until the defendant undergoes psychological treatment for his behavior. The circuit court also should consider whether the children and the defendant should undergo therapy together to work through their problems before resumption of visitation occurs.

## I.

### FACTS

The parties were married in March of 1985 and two sons were born of the marriage. William Raphael P. III (Billy) was born in May of 1985 and Mark Patrick P. was born in July of 1986. The record reflects that from

---

**1.** We follow our traditional practice in cases which involve sensitive facts and do not use the last names of the parties so as not to stigmatize them or their children. *See, e.g., Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987); *West Virginia Dept. of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

the beginning the couple had a troubled marriage. The defendant was physically and mentally abusive to the plaintiff throughout their marriage. In an attempt to improve their relationship, the parties underwent marriage counseling with Chuck Rhodes, a family counselor and therapist. The parties were unable to work through their problems and they separated. The plaintiff filed for divorce in 1988.

The plaintiff received custody of the children as she was determined to be the primary caretaker. The numerous proceedings held before the family law master focused primarily on the defendant's visitation rights which are at issue in this appeal.

At the March 3, 1992, hearing before the family law master, the plaintiff detailed the physical and mental abuse that occurred during the marriage. She testified the defendant did not want her to have either of the boys and he urged her to have abortions both times she became pregnant. He showed little interest in the children when they were infants and openly expressed his disappointment that he had boys instead of girls. The defendant was not at home very much during the early part of the marriage because of his business trips. The plaintiff testified that when she was pregnant with Mark she learned the defendant was having an affair.

The plaintiff also testified the defendant had a violent temper and would yell and curse at her in front of the children. The defendant cursed at her so frequently that even when the boys were just learning to talk they said explicit curse words. During arguments, the defendant punched and kicked the plaintiff. He threatened her with a knife. He choked her around the neck so hard she had to wear a scarf to hide the bruises. He drug her across the floor by her hair in front of the children. The plaintiff testified that when the children would witness this abuse they would scream and cry and try to hide. The defendant would hit and kick the children's toys and broke toys in front of the children in fits of rage. The plaintiff testified that "[t]he trauma and crying that these children have seen in their life is unreal."

During one argument, the defendant locked the plaintiff out of the house and kept the children inside. She testified she was afraid for the children's safety and put her fist through a window to enter the house. She severed three nerves in her arm and underwent surgery to correct the damage.

Billy and Mark have severe allergy problems and needed frequent medical treatments for ear infections, allergies, and colds when they were infants. The plaintiff testified the defendant was not sympathetic to the children's medical needs and, on certain occasions, blocked her attempts to get medical attention for the boys because he believed the plaintiff was overreacting to the children's symptoms. The defendant continued to smoke in front of the boys even though it caused them respiratory problems.

Despite the foregoing, the plaintiff maintains she encouraged the children's visitation with their father following the separation. However, she stated he exercised his visitation rights sporadically. In July of 1991, following an overnight visitation with his father, Billy informed his mother that the defendant touched him in an inappropriate manner. Billy told his mother that his father touched his penis, his father wanted Billy to touch his father's penis, and his father kissed his penis. The plaintiff believed her son and arranged for him to be counseled by Mr. Rhodes. Mr. Rhodes suggested the plaintiff take Billy to Pam Rockwell, a counselor with the sexual assault program at Family Services of Kanawha Valley.

After interviewing Billy, it was Ms. Rockwell's conclusion that Billy had been sexually abused by his father. Billy was uncomfortable talking about the incident. However, he did whisper in his mother's ear and asked her to tell Ms. Rockwell that when going to the bathroom his dad touched his penis and kissed his penis. Based upon this information, Ms. Rockwell recommended no contact whatsoever with the defendant.

Dr. John MacCallum, a psychiatrist, was first contacted by the defendant because the defendant was seeking evidence that he had done nothing inappropriate with his children. Dr. MacCallum explained he would not advocate the defendant's position, but he would

interview him and render an opinion in the case. After interviewing the defendant, it was Dr. MacCallum's opinion that no sexual abuse or inappropriate sexual contact occurred. He stated the contact Billy spoke of was innocent toilet training touching that was misinterpreted by Billy.

Dr. MacCallum was later asked by the family law master to interview the children and the plaintiff. Following those interviews, Dr. MacCallum affirmed his conclusion that no sexual abuse occurred. Billy told him that his father touched his penis once when they were going to the bathroom. Dr. MacCallum was highly critical of the interview techniques utilized by Ms. Rockwell as shown on a videotape she prepared of her interview. He claimed her questions were unduly suggestive. Based on these findings, Dr. MacCallum recommended the defendant should have no restrictions placed on his visitation rights.

During Dr. MacCallum's interview with the plaintiff, she spoke of several incidences of physical abuse she endured during the marriage. Furthermore, the plaintiff documented some rather deviant sexual behavior and/or interests of the defendant. Dr. MacCallum stated he had no reason to question the veracity of the plaintiff's statements. He also testified the boys clearly dislike their father. However, during Dr. MacCallum's deposition, he stated that for purposes of his evaluation he separated the issue of sexual abuse from questions of the general safety and well-being of the children under the circumstances of visitation.

The plaintiff testified Billy and Mark no longer want to have any contact with their father. It upsets them greatly when they have to visit with him. When the defendant comes to the house to visit, the boys frequently run and hide and have to be coaxed to come out to speak with their father. The plaintiff testified the visitations have had a profound effect on Billy. He has nightmares and acts out aggressively toward other children. Billy builds traps and barricades and frequently checks to see the doors and windows are locked because he is afraid the defendant will enter the house.

Several witnesses who accompanied the defendant on supervised visits testified regarding the boys' and the defendant's behavior. While the evidence is somewhat conflicting, it appears the boys do not want to visit their father and behave poorly in his presence. On more than one occasion, Billy demonstrated his anger at his father by hitting him.

The defendant testified and denied all sexual abuse charges. He also denied the sexual deviation allegations of the plaintiff. He denied some of the physical abuse charges and downplayed certain other charges of physical abuse and their significance in the marriage. He stated his visitations with the children are not as bad as the plaintiff contends. He testified that the plaintiff interferes with his relationship with his children. For instance, he claims the plaintiff suggests they go to places that have video games so the boys will not have to interact with him. At one point during the hearings, he alleged the plaintiff was an unfit parent because she planted the idea of sexual abuse in Billy's mind and worked to destroy whatever relationship he had remaining with his sons. The defendant agreed to undergo therapy to work on his parenting skills, but he adamantly refused to undergo therapy in regard to sexual abuse because he denies the charges and feels the evidence vindicates him.[2]

Christina Marie Arco, Ph.D., a psychologist at the Process Strategies Institute in Charleston, testified at a hearing held in October of 1994 that she provided therapy for the children. At a hearing held in January of 1995, Dr. Arco testified she was still seeing Billy for therapy. She stated that Billy's anger and aggressiveness are at very high levels. He has fears and anxieties about his father. Billy told Dr. Arco he wished his father were dead so he would not have to worry about him anymore. Dr. Arco testified that any forced visitation with his father would cause serious regression in Billy. She also stated that the negativity the children have about their father is much

---

2. In addition to Dr. MacCallum's report finding no evidence of sexual abuse, the defendant points to the fact the State dismissed the charges of criminal sexual abuse against him.

more motivated by fear, anxiety, and anger than by any negative comments that may have been made by the plaintiff.

Susan Barrows McQuade, the Director of Social Services at Family Services of Kanawha Valley and Chair of the Children's Justice Task Force in the State of West Virginia, stated she reviewed the evidence in this case. Ms. McQuade testified she believed visitation with their father would be detrimental to Billy and Mark and visitation should not be forced.

Jerry Sandoval, a child service worker with the Department of Health and Human Resources, investigated this matter and testified the plaintiff is a good parent and the children are well behaved in the presence of their mother. Based on her interviews with the plaintiff, Billy, and Mark and a review of the evidence, it was Ms. Sandoval's opinion that it is in the children's best interest not to see their father until they are old enough to decide for themselves when and where to see him.

After hearing the foregoing evidence, the family law master rendered his recommended order. He found:

> "It is clear that no sexual abuse occurred in this case, that plaintiff does not like the defendant, and justifiably so because of the history of physical violence in their marriage, but that there can be no further justification whatsoever of any restriction of defendant's right of visitation with his children."

The family law master was highly critical of Family Services of Kanawha Valley in general and Ms. Rockwell's interview techniques in particular.[3] The family law master stated that, due to the history of domestic violence in the case, for six months the defendant's visitation with the boys would be restricted to the presence of a third person. The family law master made no findings or conclusions as to the nature of the supervision.

The plaintiff filed exceptions to the family law master's recommended decision. The circuit court denied her exceptions but opened the case for further testimony regarding the nature of the defendant's visitation with the children following the plaintiff's motion to stay visitation. After hearing additional evidence on the issue of whether resumption of visitation would be harmful to the children, the circuit court ordered supervised visitation with the defendant until the boys attain an age where enforced visitation would be "meaningless." The circuit court found that "[r]egardless of whether an act of child abuse, such as alleged herein, actually occurred or not, these two children have been so indoctrinated to believe that it did occur that their attitude of distrust towards . . . [their father] renders exercise of visitation virtually impossible." The circuit court also found the record "only partially supports a conclusion that resumed visitation will result in serious psychiatric regression" and that no "high risk of suicide or withdrawal" should occur if visitation resumes.

## II.

### ABUSE ALLEGATIONS

#### A. *Sexual Abuse*

In finding that no sexual abuse occurred in this case, the family law master and the circuit court credited the report of Dr. MacCallum and discredited the reports of the other counselors, particularly Ms. Rockwell and Ms. MacQuade, as well as Billy's version of the events. This Court reviews that factual finding under the clearly erroneous standard and, if it is supported by substantial evidence, we will not overturn that finding even though we would be inclined to make a different finding or draw a contrary inference on the same set of facts. *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 465 S.E.2d 841 (1995). *See also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518, 530

---

3. The family law master stated:
      "Further, the Family Law Master would remind Family Services that far from being one of the best interviewers around, Pam Rockwell has been thoroughly discredited as an interviewer and investigator in sexual abuse cases and has shown to be a perpetrator of abusive situations where children were forced to make statements later proven untrue. FSKV would do well to make sure that all its employees not only know that but avoid any such situation in the future."

(1985). In *Stephen L.H.*, we explained some of the reasons behind the policy that a reviewing court should accord deference to the findings of fact made by a lower tribunal:

> "There are many critical aspects of an evidentiary hearing which cannot be reduced to writing and placed in a record, e.g., the demeanor of witnesses. These factors may affect the mind of a trier of fact in forming an opinion as to the weight of the evidence and the character and credibility of the witnesses. Thus, the importance of these factors should not be ignored by a reviewing court. Given a family law master's intimate familiarity with the proceedings, the family law master is in the best position to weigh evidence and assess credibility in making the ultimate ruling on disputed issues.
>
> "As we said in *Board of Education v. Wirt*, [192 W.Va. 568, 579, 453 S.E.2d 402, 413 (1994)]: 'Indeed, if the lower tribunal's conclusion is plausible when reviewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently if it had been the trier of fact.' (Citation omitted). This deference given to the lower tribunal in *Wirt* also is appropriate in the present case because the family law master 'is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match.' *Weil v. Seltzer*, 873 F.2d 1453, 1457 (D.C.Cir.1989). (Citation omitted)." 195 W.Va. at 395–96, 465 S.E.2d at 852–53. (Footnote omitted).

In this case, the family law master's factual determination that no sexual abuse occurred in this case was adopted by the circuit court. Therefore, we are guided by the standard of review articulated in Syllabus Point 1 of *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995):

> "In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-prong standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review."

Applying this standard, we cannot find the factual determination that no sexual abuse occurred in this case is clearly erroneous. The family law master and the circuit court's findings are plausible when reviewing the evidence in its entirety. The defendant adamantly denied any sexual abuse occurred. Furthermore, the testimony of Dr. MacCallum supports this conclusion and he had the opportunity to interview all the parties involved, unlike Ms. Rockwell and Dr. Arco who only spoke with the plaintiff and the children.

Our decision to affirm this portion of the circuit court's order, however, is not determinative of the final disposition of this case. We agree with the plaintiff that the final order left unresolved significant issues that must be addressed before the ultimate determination regarding the defendant's visitation rights is made. We will address these issues below.

### B. *Physical and Emotional Abuse* [4]

■ The family law master found the plaintiff suffered from physical and emotional abuse during the marriage,[5] but failed to

---

4. The defendant declined to adequately address this issue in his brief before this Court. On the issue of domestic violence, he stated: "[I]n the case before this Court, the only people discussing Domestic Violence ... [are the plaintiff and her mother] and the indoctrinated children, notwithstanding the fact that the record does not reflect any criminal action." However, we find the evidence of domestic violence certainly relevant as it goes to the children's fear and animosity toward the defendant. Indeed, we have even previously stated that domestic violence in the presence of children may constitute child abuse and that evidence of domestic violence is relevant to the issue of parental fitness. *See generally Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Furthermore, the fact the plaintiff failed to file criminal charges for abuse against the defendant is of no consequence to the finding that such physical abuse occurred and had a dramatic impact on the children.

5. The family law master stated the "plaintiff does not like the defendant, and justifiably so because of the history of physical violence in their marriage."

address the negative consequences such abuse now has on the children's relationship to and visitation with their father. To be clear, we are not speaking of a child's general reluctance to visit with his or her noncustodial parent. What we are dealing with in this case is Mark's and Billy's documented intense fears and anxieties in visiting with their father. All the expert witnesses in this case, excluding Dr. MacCallum whose findings we will address below, recommended that no forced visitation should occur because it would have a disastrous effect on the boys. Dr. Arco testified that forced visitation, even if supervised, would cause serious regression in Billy's development.

A fair reading of the record reveals that the boys' feelings of animosity toward their father are in large part due to their father's treatment of their mother. During counseling sessions, the boys stated their father was "mean" because he did "awful things" to their mother. The plaintiff testified that during the marriage the boys would scream and cry when she and the defendant would fight. The defendant's physical abuse of the plaintiff was witnessed by the boys, and they were terrified of their father because of this abuse.

The evidence of the negative impact the physical abuse that occurred during the marriage had in regard to the children's well-being was not rebutted. Dr. MacCallum failed to render an opinion in regard to the

physical and mental cruelty endured by the plaintiff and observed by the children. He clearly stated that he came to his ultimate conclusion to allow the defendant unsupervised visitation based solely on his finding that no sexual abuse occurred.

■■■ This Court joins with the majority of jurisdictions in finding that domestic violence evidence should be considered when determining parental fitness and child custody.[6] In Syllabus Point 1, in part, of *Henry v. Johnson*, 192 W.Va. 82, 450 S.E.2d 779 (1994), we stated:

"Children are often physically assaulted or witness violence against one of their parents and may suffer deep and lasting emotional harm from victimization and from exposure to family violence; consequently, a family law master should take domestic violence into account[.]"

*See* W. Va. Code, 48–2A–1(a)(2) (1992) (domestic violence statute states that children "may suffer deep and lasting emotional harm from victimization and from exposure to family violence"). Similarly, in the dissenting opinion in *Patricia Ann S. v. James Daniel S.*, 190 W.Va. 6, 18, 435 S.E.2d 6, 18 (1993), Justice Workman recognized that "spousal abuse has a tremendous impact on children" regardless of whether the children were directly abused.[7]

While custody was not at issue in this case, evidence of domestic violence is still relevant

6. In note 2 of *Henry v. Johnson*, 192 W.Va. 82, 86, 450 S.E.2d 779, 783 (1994), we found:

"By 1992, thirty-three states and the District of Columbia required Courts to consider domestic violence in determining custody and visitation. *Developments in the Law: Legal Responses to Domestic Violence*, 106 HARV. L.REV. 1597, 1603 (1993) (citing Barbara J. Hart, *State Codes on Domestic Violence: Analysis, Commentary and Recommendations*, 43 JUV. & FAM.CT.J., No. 4, 1992, at I, 29.)."

7. In *Patricia Ann S.*, 190 W.Va. at 18, 435 S.E.2d at 18, Justice Workman quoted the following excerpt from L. Crites & D. Coker, *What Therapists See That Judges May Miss*, The Judges' Journal 9, 11–12 (Spring 1988):

" 'Children learn several lessons in witnessing the abuse of one of their parents. First, they learn that such behavior appears to be approved by their most important role models and that the violence toward a loved one is

acceptable. Children also fail to grasp the full range of negative consequences for the violent behavior and observe, instead, the short term reinforcements, namely compliance by the victim. Thus, they learn the use of coercive power and violence as a way to influence loved ones without being exposed to other more constructive alternatives.

" 'In addition to the effect of the destructive modeling, children who grow up in violent homes experience damaging psychological effects. There is substantial documentation that the spouse abuser's violence causes a variety of psychological problems for children. Children raised in a home in which spouse abuse occurs experience the same fear as do battered children. . . .

\*     \*     \*     \*     \*     \*

" 'Spouse abuse results not only in direct physical and psychological injuries to the children, but, of greatest long-term importance, it breeds a culture of violence in future generations.' " (Footnotes omitted).

in deciding the visitation issue because it appears to be the root cause for why visitation has not been successful. As the expert witnesses testified, continued therapy with the children is necessary. Furthermore, it was recommended the defendant undergo therapy. Therefore, we find it necessary to remand this case to the circuit court to address the issue of physical and mental abuse that occurred during the marriage and the effect such abuse had on the children.

When family problems involving children are of sufficient depth and duration that professional counseling is needed to heal the relationships of the child or children with the parent or parents, or to assist the child or children in dealing with such emotional estrangement, a circuit court may direct participation in such counseling and may in its discretion determine how the cost of such counseling shall be paid. *See Mary D. v. Watt,* 190 W.Va. 341, 438 S.E.2d 521 (1992).

### III.

### VISITATION

Based on the foregoing, we agree with the plaintiff that supervised visitation should not immediately resume. "In *Ledsome v. Ledsome,* 171 W.Va. 602, 301 S.E.2d 475 (1983), this Court held that the right to visitation is determined by considering the child's welfare." *Lufft v. Lufft,* 188 W.Va. 339, 343, 424 S.E.2d 266, 270 (1992). The record is clear that forced visitation at this time would be detrimental to the children and futile on the defendant's behalf without professional intervention. In *Mary D. v. Watt,* 190 W.Va. at 348, 438 S.E.2d at 528, this Court held that a "family law master or circuit court may condition ... supervised visitation upon the offending parent seeking treatment." On remand, the circuit court should address this issue. The circuit court should also consider whether it would be beneficial for the defendant and the children to attend counseling sessions together to help build a more positive relationship. "Clearly, counseling for the parties would materially promote the welfare of the children." *Patricia Ann S.,* 190 W.Va. at 14, 435 S.E.2d at 14. The circuit court should also determine when supervised visitation should resume and set forth a specific visitation schedule that takes into account the best interest of the children and the defendant's interest in attaining a close relationship with his sons. *See Weber v. Weber,* 193 W.Va. 551, 457 S.E.2d 488 (1995); W. Va. Code, 48–2–15(b)(1993). On remand, the circuit court should determine if the parties can agree on a counseling or therapy setting for these children and their father. If they cannot agree, then the circuit court should take any additional evidence needed and direct the participation in such counseling as a condition of the continuation of the plan for restoring visitation.

In *Mary D.,* Chief Justice McHugh set forth guidelines to help provide children with a safe and secure atmosphere when supervised visitation is exercised. Although *Mary D.* dealt specifically with supervised visitation following a finding that sexual abuse occurred, we find it just as applicable in this case where the children harbor such strong feelings against their father, whatever the source of such emotional estrangement. It is in everyone's interest to see that supervised visitation goes as smoothly as possible. In Syllabus Point 3 of *Mary D.,* we held:

"Where supervised visitation is ordered pursuant to *W. Va. Code,* 48–2–15(b)(1) [1991], the best interests of a child include determining that the child is safe from the fear of emotional and psychological trauma which he or she may experience. The person(s) appointed to supervise the visitation should have had some prior contact with the child so that the child is sufficiently familiar with and trusting of that person in order for the child to have secure feelings and so that the visitation is not harmful to his or her emotional well being. Such a determination should be incorporated as a finding of the family law master or circuit court."

Due to the passage of time that has already occurred in this case, the circuit court, on remand, should ensure this matter receives an expedited hearing to resolve the issues raised in this opinion.

### IV.

### CONCLUSION

Based on the foregoing, the order of the Circuit Court of Kanawha County is af-

firmed, in part, reversed, in part, and this case is remanded for further proceedings consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded.

WORKMAN, Justice, concurring:

I concur with the ultimate conclusion of the majority. Furthermore, I endorse and commend Justice Cleckley for incorporating into the law an immensely important concept:

> When family problems involving children are of sufficient depth and duration that professional counseling is needed to heal the relationships of the child or children with the parent or parents, or to assist the child or children in dealing with such emotional estrangement, a circuit court may direct participation in such counseling and may in its discretion determine how the cost of such counseling shall be paid.

The majority makes clear that such counselling can be ordered as a condition of visitation. In fact, this concept is so important that it should have been a syllabus point. Circuit courts should be aware that they have this discretion, and should exercise it liberally in appropriate situations.

In addition to emphasizing this point, I write separately to disagree in one area and to amplify in another.

### SEXUAL ABUSE

First, in reviewing the family law master's finding, which was adopted by the circuit court and upheld by this Court, that there was no sexual abuse in this case, I would look to Justice Cleckley's explanation of our standard of review in *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996):

> A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Id.*, Syl. Pt. 1, in part. Using that standard, I for one am left with the "definite and firm conviction" that sexual abuse did occur, and I believe the case should have been reversed as to that finding. The six-year-old confided to his mother that his father touched and kissed his penis, and asked the child to touch his. Dr. McCallum's explanation that this was innocent touching associated with toilet training is not credible. A report compiled by Duke University after examining the boys over the course of a few days notes that pediatric textbooks generally state that children typically need no assistance in urinating by age four. Further, I cannot imagine what part kissing the penis of a six-year-old boy would play in his toilet training.

In addition to this incident, both children made statements to therapists and counsellors[1] that indicated a knowledge of sexual specifics beyond their tender years. Susan Barrows McQuade, a psychologist who had counseled the boys for over two years, noted in her report that statements such as "He did something with his tongue that felt both good and bad," "He said 'I love you' when he touched my pee-pee," and "It makes me feel scared," made it difficult to think that anything but child sexual abuse had occurred. Billy told at least two interviewers

---

1. I cannot leave this concurring opinion without commenting on the fact that the family law master below cast aspersions on the qualifications of counsellor Pamela Rockwell. Similarly, Justice Neely in several concurring and dissenting opinions, cast aspersions on Ms. Rockwell's abilities, indeed characterizing sexual abuse of children as a crime of fashion subject to mass hysteria. *See Wilt v. Buracker*, 191 W.Va. 39, 55, 443 S.E.2d 196, 212 (1993) (Neely, J., concurring); *State v. Delaney*, 187 W.Va. 212, 218, 417 S.E.2d 903, 909 (1992) (Neely, J., dissenting); *State ex rel. Spaulding v. Watt*, 188 W.Va. 124, 128, 423 S.E.2d 217, 221 (1992) (Neely, J., dissenting); *State v. Walter*, 188 W.Va. 129, 132, 423 S.E.2d 222, 225 (1992) (Neely, J., concurring). The

family law master has a duty and a right to determine who he finds credible, and Justice Neely had that right as well. However, after having had the opportunity as a circuit court judge for seven years to hear Ms. Rockwell testify on numerous occasions, I want the law books to reflect that this opinion as to her qualifications in judicial quarters is not unanimous. I have found Ms. Rockwell to have demonstrated extensive knowledge and training in the area of child sexual abuse. Frequently, counsellors and therapists, though not possessing a degree in psychology or psychiatry may have specialized training or experience in child sexual abuse which may render them even more knowledgeable and competent in that area than psychiatrists.

that his father touched his private area or "did awful things" and told him not to tell because they would get into trouble. Dr. Christina Arco, a therapist treating the children, testified that Billy presented particularly violent behavior directed toward his father, including building traps and barricades, and even planning to kill his father. Numerous witnesses testified to how frightened the boys were of their father and how they would hide or lock themselves in the car when he came to pick them up for visitation. One woman who supervised visitation testified that the boys displayed a tremendous amount of hostility to their father, several times attempting to punch him in the penis, and emphasized that this was serious hostility, not mere horseplay. This information about specific incidents of sexually inappropriate activity, together with the behavioral indicators of sexual abuse noted by various counsellors and therapists, lead me to the conclusion that the circuit court's finding of no sexual abuse was clearly wrong.

The reason that such a finding is important in the long run is that it impacts quiet significantly on the next issue — supervised visitation.

### SUPERVISED VISITATION

The opinion sets forth the important concept which we established in *Mary D.* that supervised visitation must be fashioned in a manner designed not only to *actually* protect the child, but also to make the child *feel* he is protected.

Where supervised visitation is ordered pursuant to *W.Va. Code,* 48–2–15(b)(1)[1991], the best interests of a child include determining that the child is safe from the fear of emotional and psychological trauma which he or she may experience. The person(s) appointed to supervise the visitation should have had some prior contact with the child so that the child is sufficiently familiar with and trusting of that person in order for the child to have secure feelings and so that the visitation is not harmful to his or her emotional well being. Such a determination should be incorporated as a finding of the family law master or circuit court.

Syl. Pt. 3, *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992) (quoted in syllabus

point 3 of the majority opinion). Furthermore, should the issue of supervision arise again in the future, the lower court should look to the standard established in *Carter v. Carter:*

Because of the extraordinary nature of supervised visitation, such visitation should be ordered when necessary to protect the best interests of the children. In determining the best interests of the children when there are allegations of sexual or child abuse, the circuit court should weigh the risk of harm of supervised visitation or the deprivation of any visitation to the parent who allegedly committed the abuse if the allegations are false against the risk of harm of unsupervised visitation to the child if the allegations are true.

196 W.Va. 239, 470 S.E.2d 193 (1996). When, as in the case before us, there is credible evidence of sexual abuse, the risk of harm to the child weighs heavily in this balance, and courts should err on the side of caution if necessary to protect children at risk of possible abuse.