508 S.E.2d 375

**DALE PATRICK D., Appellee,**

v.

**VICTORIA DIANE D., Appellant.**

**DALE PATRICK D., Appellee,**

v.

**VICTORIA DIANE D., Appellee,**

**Brooke Kaitlyn D., Infant, Appellant.**

**Nos. 25017, 25018.**

Supreme Court of Appeals of West Virginia.

Submitted May 13, 1998.

Decided July 17, 1998.

Workman, J., filed separate opinion concurring in part and dissenting in part.

**440**

Dale Patrick D., Pro Se.

Christopher G. Moffatt, Esq., Reed, Moffatt & Associates, Charleston, West Virginia, Attorneys for Victoria Diane D.

Maureen Conley, Charleston, West Virginia, Guardian ad Litem for Brooke Kaitlyn D., infant.

PER CURIAM: [1]

This is an appeal by Victoria Diane D.,[2] the mother of Brooke D., and Maureen Conley, the guardian ad litem for Brooke D., from a decision of the Circuit Court of Kanawha County finding no credible evidence of sexual abuse by the father of the child, Dale D., and ordering regular unsupervised visitation between the father and daughter. The mother and guardian contend that the lower court erred in failing to find credible evidence of sexual abuse. The mother and guardian also maintain that the lower court erred in granting attorney fees to Dale D. We affirm in part, reverse in part, and remand.

I. Facts

Brooke D. was born on March 10, 1991, and her parents were separated in July 1991. The mother, Victoria D., was granted temporary custody in October 1991 due to the young age of the child. Dale D. was granted visitation,[3] despite the mother's attempts to seek restriction of visitation due to Dale D.'s history of mental illness. The divorce became final pursuant to a bifurcated order dated August 11, 1992. In October 1992, Victoria D. alleged that Dale D. was unfit for unsupervised visitation due to his bipolar disorder.[4] The family law master found no reason to restrict the father's visitation and expanded such visitation to five hours each Sunday by order dated October 28, 1992.

Victoria D. attempted to obtain the medical records of Dale D., and on June 24, 1993, the lower court ordered the production of medical records from Highland Hospital. By agreed written order dated July 28, 1993, the parties jointly determined that both parties would be examined by Dr. Jerome Massenburg, a psychiatrist, for the purpose of determining whether Dale D. should have supervised visitation with his daughter and whether either party had any condition that would adversely affect that party's ability to parent the child. Dr. Massenburg's evaluation revealed that both parties were competent parents, and Dr. Massenburg concluded that Dale D.'s visitation rights should not be restricted based upon any psychological condition.

By order dated September 23, 1993, Dale D. was granted standard Schedule A visitation, including alternating weekends, one evening during the week, and alternating holidays. On December 9, 1993, Victoria D. forwarded an allegation of child abuse

---

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley,* 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4. (1992).

2. We follow our traditional practice in cases which involve sensitive facts and do not use the last names of the parties so as not to stigmatize them or their children. See, e.g., *Nancy Viola R. v. Randolph W.,* 177 W.Va. 710, 356 S.E.2d 464 (1987); *West Virginia Dept. of Human Services v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985).

3. Because Victoria D. was breast feeding Brooke, Dale D.'s original visitation order permitted visitation only for one and one-half hours two evenings per week.

4. Dr. Ted Thornton, a psychiatrist, had examined both parties prior to the marriage, and the parties had discussed Dale D.'s bipolar condition with Dr. Thornton. Dr. Thornton found that the condition was in complete remission prior to the marriage.

against Dale D. in an ex parte motion to family law master Charles Phalen. The motion included the affidavit of psychologist Linda Workman regarding her October 12, 1993, evaluation of Brooke, as well as evaluations dated October 14, October 21, November 9, November 16, November 17, and November 23, 1993. The affidavit reported that Brooke became very quiet and unresponsive when the father was mentioned, that the child reported that the father touched her bottom at night in her room, and that the child does not like to visit with the father. The affidavit further indicated that Brooke reported that the father and stepmother put on pink gloves and touched her vagina with their index and middle fingers. The child allegedly demonstrated, using a circular motion and saying, "bump, bump." She also demonstrated the index finger of one hand penetrating through the fingers of the other hand. The child also allegedly reported that it hurt when the father and stepmother touched her and that they had done it many times.

Guardian ad litem Susan Conner was thereafter appointed for Brooke, and Ms. Conner presented her report on January 10, 1994, finding that the alleged abuse had occurred and recommending supervised visitation. According to an affidavit submitted by Victoria D's attorney, William Smith, the family law master indicated during the January 10, 1994, hearing that he did not believe Victoria D's allegations, but that he would proceed to hear this matter "to cover everyone's ass." A temporary order was entered on February 15, 1994, granting Dale D. supervised visitation for one hour per week. In the numerous evidentiary hearings held throughout 1994, evidence was presented regarding Dale D.'s history of mental illness, alcohol abuse, and domestic abuse. Victoria D. and her step-mother testified concerning Dale D.'s physical abuse of Victoria D. and her three children by a previous marriage. Victoria D. related a circumstance in which Dale D. assaulted one of her children while that child was holding the young infant Brooke, causing the child to drop the infant. The evidence also revealed that law-enforcement intervention was required during a domestic dispute while Dale D. and Victoria D. were vacationing in Florida.

Additional evidence of the child's allegations of sexual abuse was presented through the testimony of the child's babysitter, Michelle Bloom. She testified that Brooke had told her that the father and step-mother had touched and manipulated Brooke's genital areas. Ms. Bloom further testified that Brooke had demonstrated the abuse by putting her hand on her genital area and moving it around. Ms. Bloom also testified that the child's behavior changed dramatically at the time of overnight visitation with Dale D., including temper tantrums, anger, staring, cringing, and expressing her desire not to visit her father.

Dr. Ward Maxson, a gynecologist, examined the child and diagnosed her a suffering from vaginitis, an infection commonly observed in victims of sexual abuse. Dr. Maxson also indicated that Brooke was overly compliant during the examination. Dale D. presented the testimony of two experts, Dr. Richard Gardner and Dr. Neil Rosenblum, regarding potentially false allegations of sexual abuse. Neither Dr. Gardner nor Dr. Rosenblum had examined Brooke, nor did they render an opinion as to whether the child had been abused.

On December 15, 1994, family law master Charles Phalen issued his recommended order finding no credible evidence of sexual abuse. Supervised visitation was continued, and gradual transition toward standard Schedule A unsupervised visitation was ordered.[5] The family law master ordered the parties and the child to submit to a "qualified family therapist for the purpose of working towards a constructive rehabilitative relationship ... [with Dale D.]."

The lower court affirmed the family law master's order on March 30, 1995, without

---

5. Mr. Tim Casey was appointed as an observer of the visitation between Dale D. and Brooke. Mr. Casey reported to the family law master on March 8, 1995, that the comfort level between the father and daughter was very favorable and that visitation was progressing well. Mr. Casey reported that Brooke frequently asked to sit on the father's lap, kissed and hugged him, and wanted to hold his hand while walking.

additional hearing, by simply signing the bottom of the family law master order. The guardian ad litem received a copy of this decision on May 15, 1995, and thereafter filed a motion to reconsider, requesting the tape-recordings of the family law master hearings. The lower court ordered the family law master to produce copies of the hearing tapes and agreed to review the transcripts of the family law master proceedings on the motion to reconsider. On August 12, 1996, the lower court entered an order affirming the family law master's determination that supervised visitation was appropriate and should gradually progress toward standard Schedule A unsupervised visitation.

On October 4, 1996, the lower court heard the guardian and mother's motions for reconsideration, and reaffirmed its prior order. On December 31, 1996, the guardian petitioned for appeal to this Court, and we refused that petition. Victoria D. subsequently filed an additional motion for reconsideration before the lower court, and such motion was denied. On the guardian and mother's subsequent petitions to this Court, we accepted the appeal.

## II. Assignments of Error

The Appellants contend that the lower court erred in finding no credible evidence of sexual abuse or family violence and erred in its assessment of the best interests of the child by failing to attribute proper weight to the findings of the guardian. The mother also contends, referencing the family law master's comment of January 10, 1994, that the family law master erred in prejudging her allegation of sexual abuse prior to taking evidence. The guardian contends that the lower court erred in failing to adequately review petitions for review, briefs, and transcripts of the family law master hearing. The Appellants also alleged that the lower court erred in awarding attorney fees of $12,-000 to the Dale D.

## III. Standard of Review

■ The applicable standard of review was explained as follows in syllabus point four of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996): "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed de novo."

## IV. Analysis

The Appellants presented a significant volume of evidence regarding Dale D.'s violent proclivities, including emotional and physical abuse toward Victoria D. and her children from a prior marriage. Victoria D. testified that Dale D. had exhibited his anger in such manner as throwing her into a bathtub, dragging her across the floor, and banging her head against a car window. Dale D. admitted that he had dragged his wife across the floor. A visitation supervisor, Ms. Beverly Hastings, testified that Dale D. had also appeared out-of-control in her presence, and Dale D. admitted that he had "reamed her [Ms. Hasting's] ass" during a visitation dispute.

■ Upon our review of this matter, we are greatly troubled by the history of domestic violence and the absence of meaningful lower court attention to the impact of such violence upon Dale D.'s visitation rights. As we indicated in *Mary Ann P. v. William R.P.*, 197 W.Va. 1, 475 S.E.2d 1 (1996), "evidence of domestic violence is still relevant in deciding the visitation issue because it appears to be the root cause for why visitation has not been successful." We have consistently acknowledged that domestic violence is potentially harmful to a child's welfare. In syllabus point two of *Mary Ann P.*, we recognized:

"Children are often physically assaulted or witness violence against one of their parents and may suffer deep and lasting emotional harm from victimization and from exposure to family violence; consequently, a family law master should take domestic violence into account[.]" Syl. pt. 1, in part, *Henry v. Johnson*, 192 W.Va. 82, 450 S.E.2d 779 (1994).

That language from syllabus point two of *Mary Ann P.* was originally generated by the West Virginia Legislature in the domestic violence statute, West Virginia Code § 48–2A–1(a)(2) (1992). The findings of the Legislature also included the recognition that

"[f]amily violence is a major health and law-enforcement problem in this state and one that affects people of all racial and ethnic backgrounds and all socioeconomic classes ..." and that "[f]amily violence can be deterred, prevented or reduced by legal intervention."

We also emphasized in *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987), "that spousal abuse is a factor to be considered in determining parental fitness for child custody." *Id.* at 714, 356 S.E.2d at 468. In *Henry*, we explained that "a family law master should take domestic violence into account when making an award of temporary custody." 192 W.Va. at 86, 450 S.E.2d at 783.[6] We found that the family law master's failure to address the domestic abuse issue in her temporary custody order rendered it "impossible for this court to determine whether the presence of spousal abuse was considered" and we remanded for further development of the domestic abuse issue. *Id.*

### V. Evaluation on Remand

 Based upon our standard of review, we conclude that the lower court's findings of fact with regard to the sexual abuse allegations were not clearly wrong. Although the lower court's finding of fact that "based upon the entire record, the accusations and allegations of violence toward the Defendant, her step-children ... are baseless, meritless and frivolous attempts on behalf of the Defendant

to deprive and deny Plaintiff of visitation with the parties' infant child...." appears to be in error,[7] such erroneous conclusion does not constitute grounds for reversal since the lower court and family law master instituted supervised visitation, the same result which would have been reached had there been a finding of domestic violence. On remand, the impact of the potential for domestic abuse must be evaluated, and the visitation determinations must be based upon the best interests of the child. In syllabus point five of *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996), we explained the "[i]n visitation as well as custody matters, we have traditionally held paramount the best interests of the child." Since there had been a substantial passage of time, the parties on remand should jointly agree upon the selection of an independent family therapist, with expertise in this area, as directed by the lower court, for the purpose of working toward a constructive family relationship and for making recommendations to the lower court as to a schedule for the gradual transition ordered by the lower court. If the parties are unable to agree upon the selection of such evaluator, the lower court shall appoint such individual.

### VI. Attorney Fees

 Based upon the merits of the Appellants' claim, we conclude that the award of $12,000 attorney fees to Dale D. was erroneous.[8] In syllabus point five of *Rogers v.*

---

6. We also noted as follows in *Henry:*
 By 1992, thirty-three states and the District of Columbia required Courts to consider domestic violence in determining custody and visitation. Developments in the Law: Legal Responses to Domestic Violence, 106 HARV. L.REV. 1597, 1603 (1993) (citing Barbara J. Hart, State Codes on Domestic Violence: Analysis, Commentary and Recommendations, 43 JUV. & FAM.CT.J., No. 4, 1992, at I, 29.). 192 W.Va. at 86 n. 2, 450 S.E.2d at 783 n. 2.

7. Justice Cleckley recently elaborated on standards of review for this Court in syllabus point one of *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), as follows:
 Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such

child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

8. Apparently, the family law master may have believed the Appellants' allegations of sexual abuse were spurious and assessed the attorney's fees against her for that reason. If that was the case, then such determination would be an abuse of discretion because there was sufficient evidence relating to the alleged sexual abuse to have justified the Appellants in pursuing this issue.

*Rogers,* 197 W.Va. 365, 475 S.E.2d 457 (1996), we explained:

> "In divorce actions, an award of attorney's fees rests initially within the sound discretion of the family law master and should not be disturbed on appeal absent an abuse of discretion. In determining whether to award attorney's fees, the family law master should consider a wide array of factors including the party's ability to pay his or her own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, the effect of the attorney's fees on each party's standard of living, the degree of fault of either party making the divorce action necessary, and the reasonableness of the attorney's fee request." Syl. pt. 4, *Banker v. Banker,* 196 W.Va. 535, 474 S.E.2d 465 (1996).

In the present case, the lower court did not make any specific findings with respect to the attorney fees issue. Likewise, the family law master failed to make specific findings of fact regarding the rationale for the assessment or the amount of fees awarded. We therefore reverse the award of attorney fees.

Affirmed in part, reversed in part, and remanded.

1. There was evidence of the Appellee's conduct which is illustrative of his violent proclivities: Dale testified regarding domestic violence against Victoria: "I threw her down and hit her on the buttocks three times with my open hand." (10–14–94 hearing.) He admitted that he got on top of his wife, holding her shoulders and legs down and leaving bruises on her body. (10–14–94 hearing.)

 In an incident while vacationing in Florida which required law enforcement intervention, Dale threw a can of beer at Victoria, dragged her across the floor, threw her on the floor, and banged her head against the floor. (10–14–94 hearing. Also referenced by step-mother, Mrs. Lawton in 9–7–94 hearing.) Dale carried and dragged Victoria's son up the stairs, holding him by his feet or ankles and dropping him head first at the top of the stairs. (9–7–94 hearing—Victoria and her children testified.) Dale pushed Victoria's daughter while she was holding Brooke, resulting in dropping Brooke into the crib and the daughter falling. (9–7–94 hearing. children and Victoria testified as to the incident.) Dale revved the car engine and maneuvered the car in the driveway so that Victoria's son believed he would be hit by the car. (9–7–94 hearing—children and Victoria.)

 Dale entered upon the property of Victoria's father and step-mother, forcing the door open and bracing himself against the door. He made threatening and hostile remarks to the step-

DAVIS, C.J., deeming herself disqualified, did not participate in the decision in this case.

WORKMAN, Justice, concurring, in part, and dissenting, in part:

I must dissent. It is incredible that the family law master and lower court made a finding of fact that the charges of domestic violence were completely meritless and without basis in light of the compelling evidence of record.[1]

Although the majority is correct in its conclusion that, had the lower court made a finding of domestic violence, the result would have been the same (i.e. supervised visitation), it seems vitally important not only that domestic violence be recognized and labeled; but also that this seven-year-old child receive the necessary protection.

The record here reflects an individual with deep-seated problems, who at minimum has a substantial temper control problem with a proclivity for violence and who indeed may even be very dangerous. Although such an individual should not be deprived of the opportunity to have a relationship with his child,[2] that child also has rights. She is

mother. (9–7–94—Mrs. Lawton). Dale challenged Victoria's father to get out of his car and fight, calling him an "old bastard." (10–14–94—Victoria's father). Dale threatened to "kick [Bill R.s] ass" if Jason R. reported domestic violence to Jason's father, Bill. (9–7–94 hearing, Dale and Jason R.) Dale locked himself in the bedroom with the infant child Brooke, refusing communication or access by other family members. (10–14–94—Dale.) Dale yelled, screamed, and expressed anger, rage, and hostility to Victoria and her children on a regular basis. (9–7–94—Dale, children.) Dale used profanity in front of children and testified that "Profanity and retaliation is necessary." (9–7–94—Dale.)

Dale testified, regarding the visitation supervisor, that he "reamed her ass" when he brought his new wife to visitation and the supervisor properly objected to the wife's presence. (10–14–94—Dale.) Dale's first wife left him due to verbal abuse, his manic depressive disorder, and alcohol abuse. (9–9–94—Dr. Rosenbloom.) Dale admitted "hostile behavior" toward his first wife. (10–14–94 hearing.) Dale testified that his first wife left and took their child to her mother after he drank and "was all hooched up." (10–14–94—Dale.)

2. I believe very strongly in the right of each parent (and the right of every child) to have a relationship with one another, and indeed that

entitled to protection as best the legal system can afford, for her safety has been placed in our hands.

Interestingly, the Appellee on oral argument indicated on rebuttal that although he and his present wife were in the midst of a divorce, there had been no allegations of domestic violence, nor any problem with regard to his unsupervised contact with the child of that marriage. Upon a motion to supplement the record by the guardian ad litem, however, we discovered that indeed the wife of the present marriage has filed several domestic violence petitions against the Appellee, including allegations that she fears for both her own and her child's safety.

On remand, the therapist, the family law master, and the trial court should be very cautious in examining the progress of the family therapy and the gradual restoration of

unsupervised visitation. Unsupervised visitation should only be allowed if the therapist and the courts below have a sure feeling that this child will be safe. As we said in syllabus point three of *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996), the risk of harm of supervised visitation to a parent if he or she is innocent of abuse charges must be weighed against the risk of harm to the child if the parent is guilty of abuse charges, and caution should be exercised on the side of the protection of the child.

---

concept is embedded into the law of this state in syllabus point nine of *White v. Williamson*, 192 W.Va. 683, 453 S.E.2d 666 (1994), wherein this Court said it was the duty of the family law master and the circuit courts to protect the rights of non-custodial parents to a continued relationship with their children.