488 S.E.2d 443

**James M. PORTER, Plaintiff–Appellant,**

**v.**

**Stephanie A. BEGO, Defendant–Appellee.**

No. 23473.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 25, 1997.

Decided May 12, 1997.

Rehearing Refused July 15, 1997.

*Andrew S. Nason,* Pepper & Nason, Charleston, for Plaintiff–Appellant.

Ilene S. Schnall, West Virginia Department of Health and Human Resources, Child Support Enforcement Division, Charleston, for Defendant–Appellee.

STARCHER, Justice:

This child-support matter is before the Court on the appeal of the plaintiff-appellant, James M. Porter, from a January 25, 1996 order of the circuit court. The order requires that the appellant pay $565.16 in monthly child support to the defendant-ap-

pellee, Stephanie A. Bego.[1] Mr. Porter challenges the amount of support, and argues that the circuit court erred in attributing income to him after finding that he voluntarily terminated his employment. He also contends that the circuit court improperly found that he wasted nearly $90,000 in savings. We find no error, and affirm the circuit court's rulings.

## I.

### Facts and Background

Appellant Porter began working for Hobet Mining in 1984. His primary job duty was to haul rock by driving a heavy-duty dump truck, a vehicle approximately 25 feet wide and weighing between 85 and 240 tons. Because of his low union seniority, he was required to work the night shift from midnight until 8:00 a.m. The appellant earned around $2,090 per month, and over a 14-year period with Hobet and other mining companies he was able to accumulate savings of nearly $90,000.

On May 8, 1991, appellee Bego gave birth to a baby girl named Madison. Since birth, Madison has experienced many severe medical problems. She has repeatedly been treated for asthma and hyperactive airway disease, suffers from hyper-thyroidism, and has a growth hormone disorder. She currently receives hormone shots costing nearly $25,000 per year. These shots are currently paid for by a private charity because the treatment is not covered by medical insurance.

Shortly after Madison's 1991 birth, appellant Porter initiated this lawsuit to determine paternity. Mr. Porter subsequently admitted paternity, and upon a recommendation from the family law master, the circuit court entered an order in October 1992 requiring the appellant to pay $565.16 per month to Ms. Bego as child support.

While the record is unclear[2], it appears that the family law master based the support recommendation on two sources of income: the appellant's salary, and the potential income from his $90,000 in savings. The law master appears to have attributed 5% interest income to this money as the potential for what that money could have earned the appellant had it been properly invested.[3]

On February 9, 1993, another hearing was held before a family law master.[4] There are

---

1. The appellee has remarried since the filing of this action; she is now known as Stephanie Bego–Stamper.

2. We are disturbed by the many necessary items missing from the file in this case. For example, the family law master apparently held an initial hearing in September 1991. The family law master's recommended findings of fact and conclusions of law, and his calculations for child support resulting from this hearing, are not in the court file. Fortunately, the circuit court incorporated these recommendations into its October 1992 order.

   It is the duty of a circuit clerk to maintain the completeness and integrity of items in the court file. See, e.g., W.Va.R.Civ.P. Rule 79 [1995]. However, we believe it is the duty of the litigants to insure that all of the proper documents find their way into the court file. This is particularly important in domestic relations cases such as this one, filed in 1991 three months after the child was born. Because this case could be subject to court supervision until the year 2009 or beyond, we feel the parties must bear the burden of creating a clear, concise record for future review. Otherwise, future courts may issue confusing and conflicting rulings, creating frustration for the parties and leading to more appeals. A court file documenting a child custody dispute is meant to be a history of an endeavor to find what is best for the interests of the child, not a breeding ground for litigation.

3. This method for attributing investment income is now specifically recognized by statute. W.Va. Code, 48A–1A–3(a) [1997] states that "Income may also be attributed to a parent if the court or master finds that the obligor has nonperforming or under-performing assets." This Code section goes on to provide the test for determining whether to attribute income:

   (d) The court or master may attribute income to a parent's non-performing or under-performing assets, other than the parent's primary residence. Assets may be considered to be non-performing or under-performing to the extent that they do not produce income at a rate equivalent to the current 6–month certificate of deposit rate, or such other rate that the court or master determines is reasonable.
   W.Va.Code, 48A–1A–3(d) [1997].

4. The evidence reviewed by the family law master, and his findings of fact and his conclusions of law, are again not contained in the record.

indications that appellant Porter had by this time disposed of all of his $90,000 savings. Because of the loss of interest income, the law master filed a recommended order on March 3, 1993 recommending that the appellant's child support obligation be reduced from $565.16 to $485.82. The appellant filed exceptions to the law master's recommended order with the circuit court. There is nothing in the record to show whether the circuit court ever considered or ruled upon appellant's exceptions. The parties agree that the circuit court never entered a written order adopting the recommendation of $485.82 in child support.[5]

Next, without benefit of counsel, the appellant filed yet another petition for modification of child support on March 22, 1993, less than three weeks after the law master filed his recommended order in the appellant's previous petition to modify support. This petition stated that a substantial change had occurred because "[d]ue to illness ... [he was] unable to work." The law master considered the petition without holding a hearing, and upon the law master's recommendation, the circuit court ruled on June 23, 1993 that the appellant had failed to state sufficient grounds for a reduction in child support.

Five days later, on June 28, 1993, the appellant filed another petition for modification of child support. This *pro se* petition alleged that:

A substantial change in circumstances has occurred because: of no income for support due to illness and coal strike as of this date I'm still under doctors care for recent surgery. I' [sic] have no source of income at this time, my last pay check was $28.93 (4–11–93) off from work 2–20–93 to present.[6]

A hearing on this petition was held before the family law master on September 1, 1993, who subsequently issued recommended findings to the circuit court. The appellant filed exceptions to these recommendations with the circuit court.

In its December 2, 1993 order overruling the appellant's objections, the circuit court affirmed the law master's recommendations and further found that the appellant had "shopped for doctors" since February 1993 to avoid paying child support. Exhibits attached to the order show that the appellant had 32 doctor visits with at least 12 doctors between February 24 and May 14, 1993. The problems noted by the doctors range from diarrhea and severe snoring (caused by a deviated septum) to tonsillitis. In each case, the doctor issued a note that the appellant had visited his office but would be able to return to work, *usually the next day*. Additionally, the circuit court acknowledged that Hobet Mining was the focus of a miners' strike at the time, but found that the appellant "refuses to pull strike duty so as to avoid earning any strike pay." The circuit court concluded that the Mr. Porter's "reduction of income is self-induced" and awarded Ms. Bego a decretal judgment for unpaid child support.[7]

Following the circuit court's ruling, on January 6, 1994 appellant Porter filed another

The appellee alleges that this hearing is the result of a petition to modify child support filed on October 8, 1992, two days after the circuit court entered its first order. This petition likewise is not in the record.

**5.** Counsel for the appellant indicated in his reply brief that he recalls the circuit court "announced during a hearing on the exceptions in his office that child support would be $485.82." We do not consider this unsupported recollection. As we have stated numerous times, it is a well-recognized principle of law that a circuit court speaks only through its record and written orders. *See Harvey v. Harvey*, 171 W.Va. 237, 298 S.E.2d 467 (1982); *State ex rel. Mynes v. Kessel*, 152 W.Va. 37, 158 S.E.2d 896 (1968); *Powers v. Trent*, 129 W.Va. 427, 40 S.E.2d 837 (1946).

**6.** The appellant also alleged that, because of the miners' strike and a change in insurance companies by his employer, he could no longer cover the medical expenses for the child.

**7.** In the December 2, 1993 order, the circuit court calculated the appellant's child support arrearage with the assumption that child support was set at $485.82 per month. This monthly amount appears to be based on the March 3, 1993 law master recommendation for which no circuit court order was ever entered. The last circuit court order in the record reflecting the amount of child support, dated October 6, 1992, set child support at $565.16 and was still fully in effect. Neither party pointed out this calculation error to the circuit court, nor did any party appeal the December 2, 1993 order to this Court.

petition for modification of child support. This appeal arises from that petition. The basis for the new petition was the appellant's allegation that in December 1993 he quit working at Hobet Mining.

A final hearing on this latest petition was held February 9, 1995 [8]. The appellant, now represented by counsel, attempted to prove he quit working at Hobet Mining because of a sleep disorder. The appellant testified that he would leave home for work at 10:00 p.m. and arrive at work around midnight. While driving equipment at work, he said he sometimes would fall asleep and almost have accidents. Rather than eat during the 4:00 to 4:30 a.m. lunch break, he testified he would often sleep. When he left work at 8:00 a.m., he said he would pull off the road and take a nap for an hour to an hour-and-a-half. When he arrived home at noon he would be unable to sleep soundly. The appellant testified that he would "eat a little bit" during the afternoon; medical records indicate he would often wake up and eat a large meal around 3:00 p.m. He would then sleep from 5:00 p.m. until 9:00 or 9:30 p.m.

The appellant also served as a volunteer fireman. He testified that he would sometimes have to report to an accident or fire, spend several hours at the scene, and then spend several hours either cleaning up the scene or at the fire station cleaning the equipment. It also appears that the appellant would sometimes stop at the fire station on his way home from his job at Hobet Mining.

The appellant testified that he felt on edge, that he continued to doze off and that he was having problems and stress caused by the back-and-forth driving. This prompted him to visit several doctors. He told his doctors that it was "just too much," that "I just can't do it anymore" because "I'm going to end up falling asleep on the job" and causing a serious accident. Therefore, in December 1993, he quit his job at the mine. Since that date he has worked various odd jobs, including as a stock clerk at a local grocery store.

Three expert witnesses testified and medical records were introduced showing that the appellant visited various doctors complaining of indigestion, gastritis, and a burning sensation in the middle of his stomach. The appellant was diagnosed as having a generalized anxiety disorder and some depressed moods, such that he would not always react to situations properly. The appellant also complained to the doctors of difficulty sleeping during the day and, conversely, of problems staying awake while working at night. The physicians gave their opinions that stress, shift work, and poor eating habits were at the heart of his problems.[9]

However, on cross-examination, it became clear that none of the appellant's expert witnesses gave an opinion that the appellant was required to quit his shift work at the mine for health reasons. As an example, the appellant's counselor testified that it was *the appellant's* opinion that his sleep problems were likely to cause an accident. The counselor testified that, even though the appellant had an adjustment disorder diagnosis, the appellant could "work any job."

Furthermore, on cross-examination the appellant was questioned about the $90,000 in savings (which he accumulated over a period of 14 years) and how he managed to dispose of all this money over an 18-month period. He explained that he helped his sister who was "about to lose her home" by giving her a gift of $23,000. He helped an aunt "work on

---

**8.** Several hearings on the January 1994 petition were continued due to scheduling conflicts by the parties and the failure to send notices of scheduled hearings, but the longest delay was caused by the appellant filing a motion to recuse family law master Charles Phalen from his case. Mr. Phalen voluntarily recused himself and C. Page Hamrick was appointed as family law master.

**9.** For example, a report dated October 30, 1992 from Dr. George Zaldivar was introduced. Dr. Zaldivar examined the appellant for a potential

sleep disorder, but found only obesity, shift work, and "possible sleep apnea." He stated:

> I have given him sleep rules to try to follow. I discussed with him for a long time physiology of his night time shift and ways to try to sleep better in the daytime. I told him that it might be necessary to give him some sleeping pills in the daytime so that he can sleep. He needs to change his dietary habits as well, eating at night time and not so much in the daytime. If sleep apnea is present it is only part of his problem.

her house" by giving her a birthday gift of $8,000 to build a new kitchen. He also recalls doing work on another house, but could not recall how much he spent. He spent $4,200 on an 8–year–old used Oldsmobile, paid off credit card debts, and paid off a loan for his mobile home (which was sitting vacant and unrented at the time of the hearing).

The family law master considered the evidence presented, and concluded that the appellant "has not overcome the previous findings of this Court that his decline in income was self-induced, both by his voluntarily giving up his employment and by his profligate waste of his investments." The law master went on to state:

> The Family Law Master finds that plaintiff has not proved that he was forced to give up his previous employment by a medical problem involving a sleeping disorder as he has maintained. While plaintiff has been diagnosed with a generalized anxiety disorder, he has not shown any connection with the loss of his previous employment.

The law master recommended that the appellant's child support obligation should continue to accrue at $565.16 per month based on the last order of record, but that he could avoid contempt of court by paying $177 per month. The circuit court adopted these findings by order dated January 25, 1996. The appellant appeals this order.

## II.

### Standard of Review

■ We have repeatedly stated that we will accord great deference to findings of fact by a family law master. While questions of law are reviewed *de novo*, the application of the law to those facts is reviewed under an abuse of discretion standard. We recently reiterated this approach in Syllabus Point 1 of *Mary Ann P. v. William R.P., Jr.*, 197 W.Va. 1, 475 S.E.2d 1 (1996):

> In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-prong standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review. Syl. pt. 1, *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995).

With this three-pronged standard in mind, we now review the appellant's arguments.

## III

### Discussion

The appellant essentially raises two issues for our consideration. The primary issue is whether the circuit court properly attributed income to the appellant, and whether the court correctly found that appellant had both self-induced his reduction in income and wasted his $90,000 savings. The appellant argues that the circuit court misinterpreted the evidence and argues that the evidence shows that his income was reduced as a result of his medical problems, thereby justifying a reduction in the amount of his child support obligation.

The second argument raised by the appellant is that the circuit court should have set his support obligation at $482.62 in accordance with the family law master's March 3, 1993 recommendations, and not $565.16. The appellant contends that we should require the circuit court to enter an order ruling on and adopting the March 3, 1993 recommendations, even though the he objected to them at the time.

### A.

### Attributed Income

We begin by noting that in 1996, the Legislature enacted new *West Virginia Code* sections, Articles 1A and 1B of Chapter 48A, to standardize the system for calculating child support obligations:

> ... so as to ensure greater uniformity by those persons who make child support recommendations and enter child support orders and to increase predictability for parents, children and other person who are directly affected by child support orders.

*W.Va.Code*, 48A–1B–1(a) [1996]. The Legislature modified these new statutes in the

1997 legislative session. *See generally, W.Va.Code,* 48A–1A–1 to –32, 48A–1B–1 to –16 [1997]. These statutes were not in effect at the time the circuit court calculated the appellant's support obligation.[10] Instead, the circuit court was guided by the *Code of State Rules.*[11] However, the new *West Virginia Code* sections are substantially similar to the *Code of State Rules* and determine the future administration of child support issues. Accordingly, our decision will focus on the interpretation and application of the new *West Virginia Code* sections.

When there has been a judicial determination of paternity, the paternal parent is required to support his child under *W.Va. Code,* 48A–6–4 [1995].[12] *See also,* Syllabus Point 2, in part, *Kathy L.B. v. Patrick J. B., Jr.,* 179 W.Va. 655, 371 S.E.2d 583 (1988).

We have repeatedly stated that family law masters and circuit courts must follow legislative guidelines for determining the amount of child support, unless they can make specific findings in the record supporting a deviation from the guidelines. *See, e.g.,* Syllabus Point 1, *Wood v. Wood,* 190 W.Va. 445, 438 S.E.2d 788 (1993); Syllabus Point 3, *Gardner v. Gardner,* 184 W.Va. 260, 400 S.E.2d 268 (1990). In the 1996 and 1997 revisions to the *West Virginia Code* the Legislature has incorporated these decisions.

Therefore, we reiterate that in determining the amount of child support, *W.Va.Code,* 48A–1B–1 [1996] creates a rebuttable presumption that the amount of the award which would result from the application of the Guidelines for Child Support, *W.Va.Code,* 48A–1B–1 to –16 [1997], is the correct amount of child support to be awarded. Any reason for deviation from the Guidelines and the amount of the calculated Guidelines award must be stated on the record, preferably in writing on the worksheet or in the order. The circuit court or family law master may disregard the Guidelines formula only after making specific findings that the Guidelines are inappropriate, and that the deviation is necessary to accommodate a specific need of the child or circumstance of the parents. *W.Va.Code,* 48A–1B–14 [1996].

Under the Guidelines for Child Support, the amount of child support is based upon both parents' adjusted gross income. *W.Va. Code,* 48A–1B–2 [1997]. "Adjusted gross income" means gross income less the payment of previously ordered child support, spousal support or separate maintenance. *W.Va. Code,* 48A–1A–2 [1997]. "Gross income" means all earned and unearned income, *W.Va.Code,* 48A–1A–19(a) [1997], and includes attributed income. *W.Va.Code,* 48A–1A–19(b)(5) [1997].[13]

---

**10.** Some of the new statutes will not be effective until July 1, 1997, namely those provisions of Article 1B "which would create a new method of calculating child support obligations based on an income shares model." *W.Va.Code,* 48A–1B–1(d) [1996].

**11.** Prior to 1996, title 78, series 16 of the *Code of State Rules* embodied all of the regulations concerning the calculation of child support obligations. Section 4 dealt specifically with methods for attributing income. *See* 78 *C.S.R.* § 16.4.1, *et seq.* These regulations were created in 1988 pursuant to statutory authority, and that statutory authority was reenacted in 1996. Many of 1996 statutory changes mirror or conflict with the regulations, although the regulations continue to have some undetermined effect. "To the extent that any definition set forth in article one-a [§ 48A–1A–1 et seq.] of this chapter is inconsistent with the manner of calculating a support obligation" under the regulations, "such definition shall have no application until" July 1, 1997. *W.Va.Code,* 48A–1B–1(d) [1996].

**12.** *W.Va.Code,* 48A–6–4 [1995], now states:

(a) When the defendant, by verified responsive pleading, admits that the man is the father of the child and owes a duty of support, or if after a trial on the merits, the court shall find, by clear and convincing evidence that the man is the father of the child, the court shall order support in accordance with the provisions of this section.

(b) The court shall give full faith and credit to a determination of paternity made by any other state, based on the laws of that state, whether established through voluntary acknowledgment or through administrative or judicial process.

This *West Virginia Code* section was enacted in 1986. It has been amended twice since the birth of the parties' daughter, but its effect is substantially the same as that in effect in 1991.

**13.** *W.Va.Code,* 48A–1A–19 [1997] provides, in pertinent part:

(a) "Gross income" means all earned and unearned income. The word "income" means gross income unless the word is otherwise qualified or unless a different meaning clearly appears from the context. When determining

■ "Attributed income" means income not actually earned by a parent, but which may be attributed to the parent because he or she is unemployed, is not working full time, is working below full earning capacity, or has non-performing or under-performing assets. *W.Va.Code,* 48A–1A–3(a) [1997].[14] Attributed income consists of moneys which a support obligor should have earned had he or she diligently pursued reasonable employment opportunities, or reasonably utilized, applied, or invested their assets.

■ If a parent obligated to pay support voluntarily, and without cause, reduces his or her employment income, then the court or family law master may establish that parent's gross income at a level similar to his or her previous income, or at a minimum, what the obligor could earn working forty hours per week at the federal minimum wage. If, for reasons within their control, the obligated parent fails to reasonably use his or her assets (other than the parent's primary residence) in a manner so that the assets are likely to produce an average or reasonable economic return, then the court or family law master may attribute reasonable investment income for the asset.

*W.Va.Code,* 48A–1A–3(b) sets out the three-part test that a court or master must consider in deciding whether to attribute employment income:

(b) If an obligor: (1) Voluntarily leaves employment or voluntarily alters his or her pattern of employment so as to be unemployed, underemployed or employed below full earning capacity; (2) is able to work and is available for full-time work for which he or she is fitted by prior training or experience; and (3) is not seeking employment in the manner that a reasonably prudent person in his or her circumstances would do, then an alternative method for the court or master to determine gross income is to attribute to the person an earning capacity based on his or her previous income. If the obligor's work history, qualifications, education or physical or mental condition cannot be determined, or if there is an inadequate record of the obligor's previous income, the court or master may, as a minimum, base attributed income on full-time employment (at forty hours per week) at the federal minimum wage in effect at the time the support obligation is established.[15]

This *West Virginia Code* section allows a family law master or circuit court to attribute

whether an income source should be included in the child support calculation, the court or master should consider the income source if it would have been available to pay child-rearing expenses had the family remained intact or, in cases involving a nonmarital birth, if a household had been formed.

(b) "Gross income" includes, but is not limited to, the following:

. . .

(5) Attributed income of the parent, calculated in accordance with the provisions of section three, article one-a of this chapter. . . .

**14.** *W.Va.Code,* 48A–1A–3(a) [1997], states:

(a) "Attributed income" means income not actually earned by a parent, but which may be attributed to the parent because he or she is unemployed, is not working full time, or is working below full earning capacity, or has nonperforming or under-performing assets. Income may be attributed to a parent if the court or master evaluates the parent's earning capacity in the local economy (giving consideration to relevant evidence that pertains to the parent's work history, qualifications, education and physical or mental condition) and determines that the parent is unemployed, is not

working full time, or is working below full earning capacity. Income may also be attributed to a parent if the court or master finds that the obligor has nonperforming or under-performing assets.

**15.** This standard is similar to that found in the *Code of State Rules.* 78 *C.S.R.* § 16 states, in part:

4.1.2. If a court or master determines that a limitation on income is not justified in that it is a result of a self-induced decline in income, a refusal to occupy time profitably, or an unwillingness to accept employment and earn an adequate sum, the court or master may consider evidence establishing the support obligor's earning capacity in the local job market, and may attribute income to such obligor.

4.1.3. As an alternative to the method of determining attributed income provided for in subdivision 4.1.2, where a support obligor is remarried and is unemployed, underemployed or is otherwise working below full earning capacity, the court or master may attribute income to the support obligor in an amount not to exceed that which could be derived by the obligor from full-time employment at the current minimum wage.

income to a parent when there is evidence that the parent has, without a justifiable reason, voluntarily acted to reduce their income. However, once that parent demonstrates they are diligently seeking employment as would a reasonable, prudent person, *W.Va.Code,* 48A–1A–3 [1997] permits the law master or court to reconsider whether to attribute income to the parent.

Whether a parent has reduced their income "without cause" is necessarily a fact-based determination that will change on a case-by-case basis. We can foresee reasonable reasons for a parent to voluntarily reduce his or her income with cause. For instance, a parent may decide not to work 30 hours of overtime a week in order to spend more time with the child, or an aging parent may accept an early retirement package from an employer when there is a possibility his or her job may be eliminated in a future "reduction in force." *W.Va.Code,* 48A–1A–3(c) [1997] lists other specific instances where income may not be attributed and which may be instructive, such as to provide care to a child of preschool age or a handicapped child, or to pursue education, self-employment, or some other plan of self-improvement.[16] Essentially, a family law master or court should examine what a reasonable, similarly-situated parent would have done had the family remained intact or, in cases involving a nonmarital birth, what the parent would have done had a household been formed.

With these standards in mind, after carefully reviewing the record we find no error. There is substantial evidence in the record to support the conclusion that the appellant voluntarily, without just cause, quit his job with Hobet Mining. We agree with the circuit court that the medical evidence produced by the appellant is insufficient to support the conclusion that the appellant was forced to quit his job for medical reasons. There is also substantial evidence that the appellant voluntarily acted to reduce his interest income by disposing of his $90,000 savings on items totally unrelated to the welfare of his daughter.[17]

We also agree with the circuit court that the appellant has failed to prove that he has acted as a reasonable, prudent person, and failed to diligently pursue employment in fields which are commensurate with his skill, education, and employment background. The appellant quit his job at Hobet without first trying to secure alternate employment. The appellant produced evidence that he is licensed and skilled to work numerous jobs in the mining and construction industry, and that he is skilled as a heavy equipment operator and foreman. However, it appears that he has only attempted to apply for one job in the mining industry; his resume was returned by the company because he had incorrectly applied for an engineer's position. We recognize that jobs in the mining and construction industry are scarce, but this does not excuse the appellant from at least trying to find a higher-paying job.[18]

16. *W.Va.Code* 48A–1A–3(c) [1997] states:
   (c) Income shall not be attributed to an obligor who is unemployed or underemployed or is otherwise working below full earning capacity if any of the following conditions exist:
   (1) The parent is providing care required by the children to whom the parties owe a joint legal responsibility for support, and such children are of preschool age or are handicapped or otherwise in a situation requiring particular care by the parent;
   (2) The parent is pursuing a plan of economic self-improvement which will result, within a reasonable time, in an economic benefit to the children to whom the support obligation is owed, including, but not limited to, self-employment or education: Provided, That if the parent is involved in an educational program, the court or master shall ascertain that the person is making substantial progress toward completion of the program;

   (3) The parent is, for valid medical reasons, earning an income in an amount less than previously earned; or
   (4) The court or master makes a written finding that other circumstances exist which would make the attribution of income inequitable: Provided, That in such case, the court or master may decrease the amount of attributed income to an extent required to remove such inequity.

17. We are flabbergasted that the appellant would pay for his sister's house in Columbus, Ohio and buy a birthday present of a kitchen for his aunt, while his own daughter is forced to rely on a charity organization to pay for necessary medication.

18. The record indicates that appellant Porter also owned a mobile home which he was not using as his primary residence. Part of the ap-

By creating the child support guidelines, the Legislature did not mean to impose an impossible requirement. The Legislature simply "recogniz[ed] that children have a right to share in their natural parents' level of living.... [T]he guidelines are structured so as to provide ... that child support will be related, to the extent practicable, to the level of living that children would enjoy if they were living in a household with both parents present." *W.Va.Code*, 48A–1B–1(b) [1996].

### B.

### *Support Obligation*

■ The second issue raised by the appellant is the amount of support which he should be required to pay. He insists that the family law master erred in setting the support obligation amount at $565.16, and by doing so ignored the March 1993 family law master recommendation of $485.82 in child support. The appellant argues that under our holding in *Phillips v. Phillips*, 188 W.Va. 692, 425 S.E.2d 834 (1992), the circuit court should be required to enter an order adopting the lower support obligation. We believe that the appellant's reliance on this case is misplaced.

In *Phillips*, the family law master calculated the father's child support at $333.78 per month and both parents waived, in writing, their right to appeal that recommended support obligation to the circuit court. The father immediately began making monthly payments of $333.78 in accordance with the master's recommendation. However, due to some oversight, the circuit court failed to enter an order accepting the family law master's recommendation. We held that under these circumstances a circuit court should correct its oversight and enter an order reflecting the parties' agreement. 188 W.Va. at 695–96, 425 S.E.2d at 837–38.

In the instant case the facts are substantially different. The parties have failed to agree on anything involving the welfare of their daughter. The case file is replete with petitions for modification of child support and motions for contempt sanctions over visitation rights, and the appellant has appealed every family law master recommendation to the circuit court. The appellant filed exceptions to the $485.82 recommendation in the circuit court, thereby temporarily preempting its enforcement. We see nothing in the record to show that the appellant ever pursued these exceptions with the circuit court, and nothing to show that he withdrew his exceptions and asked the circuit court to enter an order adopting the March 1993 recommendation. We also see nothing to show that the appellant ever relied on these recommendations in ordering his affairs.

The appellant has proceeded at times with counsel, and at times without. We realize the procedures found in the family law master system can be confusing to a *pro se* litigant. We encourage law masters and circuit courts to act cautiously with unrepresented parents and guide them through the labyrinth. However, the polar star is always the best interests of the child, and we cannot allow individuals such as the appellant to repeatedly abuse the system to avoid parental obligations.

Therefore, we find that the circuit court correctly determined that because Mr. Porter filed exceptions to the March 3, 1993 recommendation of $485.82, and failed to attempt in any way to rely on that recommended order, the recommendation was of no effect. The family law master was then free in subsequent proceedings to exercise his discretion to determine the appellant's gross income and support obligation using whatever sources he thought necessary. We find that the law master and the circuit court properly set the support obligation at

pellant's $90,000 savings went to pay off the loan for this mobile home. The testimony by the parties indicated that by the time of the final hearing the mobile home was in a state of disrepair and unrentable. However, there was also no attempt to repair the mobile home and to rent it to produce income. This evidence was not considered by the family law master or circuit court in its rulings, and we make no judgments concerning this property. However, it appears that this is the type of asset that the Legislature conceived to be "nonperforming or under-performing" such that a court could attribute reasonable investment income under *W.Va.Code*, 48A–1A–3(d) [1997].

$565.16, in reliance on the appellant's attributed income.

IV.

*Conclusion*

For the reasons stated above, the January 25, 1996 decision of the circuit court is affirmed.

Affirmed.